**UNITED STATES of America,**
**Plaintiff,**

v.

**WOOD, WIRE AND METAL LATHERS INTERNATIONAL UNION, LOCAL UNION 46, and the Joint Apprenticeship Committee of the Employing Metallic Furring and Lathing Association of New York and Local No. 46 of the Wood, Wire and Metal Lathers International Union, Defendants.**

**No. 68 Civ. 2116.**

United States District Court,
S. D. New York.

May 12, 1971.

As Amended June 2, 1971.

Supplemental Opinion June 16, 1971.

---

Whitney North Seymour, Jr., U. S. Atty. for Southern Dist. of New York, for plaintiff, Michael C. Silberberg, Joel Harris, New York City, of counsel.

Doran, Colleran, O'Hara & Dunne, New York City, for defendant, Wood, Wire & Metal Lathers International Union, Local No. 46, Walter Colleran, New York City, of counsel.

Doran, Colleran, O'Hara & Dunne, and M. Carl Levine, Morgulas & Foreman, New York City, for defendants, The Joint Apprenticeship Committee of Employing Metallic Furring & Lathing Assn. of New York and Local No. 46 of the Wood, Wire & Metal Lathers International Union, Walter Colleran, Albert Foreman, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

This is a contempt proceeding under a consent decree in an action brought by the United States pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. In the complaint, filed on May 22, 1968, the Government charged that defendant Local Union No. 46 of the Wood, Wire and Metal Lathers International Union, "has engaged and is engaged in a pattern and practice of discrimination in employment against Negroes on account of their race." The alleged pattern and practice was said to have included (Complaint, par. 8):

"(a) Adopting and implementing a policy which prevents the transfer of Negro journeymen lathers into the union;

"(b) Affording job referral opportunities to union members and other white persons not afforded to Negro lathers with similar qualifications;

"(c) Engaging in acts and practices, the purpose and effect of which are to replace Negro lathers on the job with white union members and other white persons."

Defendant Joint Apprenticeship Committee, a group comprised of union and employer association representatives, was accused of discriminating on account of race in admissions to the apprenticeship program. Finally, both the Union and the Joint Apprenticeship Committee were charged with having "failed and refused to take reasonable steps to eliminate the effects of past discriminatory acts and practices."

After 18 months of pleadings and motions, and on the eve of the date set for commencement of trial, the parties entered into an interesting and potentially creative agreement as the basis for a consent decree. As is evident from the fact that the court is now considering charges of contempt, the agreement and decree have not yet achieved the solid resolution for which all affected may have hoped. It may be, moreover, that the hope for more or less voluntary collaboration will not be furthered by, or even capable of surviving, findings that defendant Local Union has violated obligations under its own agreement embodied in this court's decree. Nevertheless, the charges of violation are here. They must be resolved. As will appear, the court is compelled to sustain them in substantial measure. It seems appropriate at the same time to reaffirm that the goal of voluntary compliance is obviously preferable to the litigation model of breach and compensatory sanction. And the court will seek in the disposition here made to leave the voluntary course open to the extent possible.

## I.

Local 46 has exclusive jurisdiction over two types of construction work in New York City and Nassau, Suffolk and Westchester Counties. Metallic lathing and furring, "inside" work, is performed

only by men who have completed an apprenticeship. "Outside" work, embracing various tasks involved in concrete reinforcing, includes no skills requiring an apprenticeship. The operations in this category range from the tying of steel or slab, learnable in a matter of minutes or a few hours, to more complex work at bending machines. All the several skills involved in such work are traditionally learned, and are accessible to men of ordinary intelligence and dexterity, by varying amounts of on-the-job training.

Three kinds of workmen come under the jurisdiction of Local 46: Local members, members of sister locals of the International, and permit holders. Local 46 members, whose apprenticeship program trains them for inside work, perform both inside and outside work. Members of other locals working under Local 46's jurisdiction are restricted to inside work. Permit holders are not union members, have not been apprenticed, and perform only outside work.

Until recently, there were few nonwhite union members or permit holders. Of the approximately 1450–1500 members in 1968, four were black. There are now 13 nonwhites in a substantially unchanged total membership, and, pursuant to the agreement incorporated in the consent decree, there appear to be 25 nonwhite apprentices. No nonwhite received a permit until 1966; by the time the instant contempt proceeding was commenced there were 165 nonwhite permit men out of an approximate total of 2000.

As the settlement agreement recites, "the Union enjoys the exclusive right to refer men for employment within its work jurisdiction and territory and to require the employers with whom the Union has collective bargaining agreements to request the referral of men by the Union whenever the employers wish to employ men * * *." At all material times, before and since the consent decree, the Local has operated a hiring hall. Especially useful in an industry where jobs may be of relatively short duration,

a hiring hall, fairly administered, serves as a useful means for coordinating the needs of employers and job-seekers. A business agent of Local 46 is in charge of referrals to each of four territorial subdivisions. As jobs become available and come to his attention, he distributes the work.

Before the consent decree various practices associated with the operation of the hiring hall led the Government to allege in its complaint that the Union was "[a]ffording job referral opportunities to union members and other white persons not afforded to Negro lathers with similar qualifications." For present purposes, it is only necessary to note certain procedures by which men got outside work under the Union's jurisdiction. Although there was supposedly a rule requiring any man seeking work in New York City to appear personally at the hall and put his name on "sign-in" lists, the rule was not enforced against Local 46 members, nearly all of whom were white. Local 46 men were permitted to ask by telephone for referral to jobs in New York City and elsewhere, and it was the practice to make such referrals. In addition, Local 46 members were permitted to call foremen or employers directly, or go to a job site, to arrange for a job. Nonmembers were not so privileged. For the men who did come to the hall, the business agents admittedly "didn't pay too much attention to" the list of men seeking outside work. Although a man's experience in the trade, when it was known to the business agent, was probably a factor in making referrals, the evidence is persuasive that (1) Local 46 men were preferred in referrals over all other categories of workers, and (2) among permit men, sons and brothers of Local 46 members were to be given preference in referrals. Telephone requests for specific permit men, sometimes inexperienced, were made by foremen and deputy foremen, and these were routinely granted by business agents. Employers were permitted to shift employees from one job site to another without going through the hiring hall,

and a foreman would sometimes simply choose men he wanted from another site.

The settlement agreement embodied in this court's decree on consent was designed to change those referral practices in significant respects. In a paragraph numbered "6–7," which defendant Local correctly identifies as being at the heart of the present controversy, the agreement provides for *"Equal employment opportunities:"*

"With respect to registration on the open employment lists,[1] job referral from the open employment lists, job layoff, job transfer, job assignment, work conditions and overtime, the rules and procedures of the Union shall apply equally to all workmen, and shall afford to Negro workmen employment opportunities equal to those afforded to other workmen; all workmen shall be treated on a nondiscriminatory basis and without any preference on account of union membership or on account of time worked under a collective bargaining agreement, except that experience in the trade may be used as a basis for preference if it relates to the ability of the workmen to perform the work required. Within 6 months of the date upon which this Agreement becomes fully effective, as hereinafter provided, the Union will develop and present to the Administrator and the USA objective rules and procedures to implement the foregoing provision. Such rules and procedures shall be agreed upon by the Administrator and the parties hereto, or failing such agreement, shall be determined by the Court."

In subsequent paragraphs the agreement expands on the subject of equality in overtime assignments and in procedures governing "suspension and termination of any right to work," and then proceeds to provide for the maintenance and (if needed) change of a "system for the issuance of [work] permits" consistent with "the purpose of achieving equal employment opportunity." A work permit is, in the words of the agreement, "the registration card for outside work that is issued by the Union to persons who are neither members of the Union nor members of other local unions of the International."

The agreement requires the Union to file a monthly verified report containing detailed information, broken down by race, about such matters as number of union members and permit holders, hours worked by the various categories of workers, and distribution of overtime.

The somewhat novel and perhaps most interesting part of the agreement is its provision creating the office and function of an "Administrator." This official, it is provided, is to be "an impartial person" appointed by the court. The range of his powers and duties is broad:

"The Administrator shall be empowered to take all actions, including the establishment of record-keeping requirements, as he deems necessary to implement the provisions of this Agreement, to ensure the performance of this Agreement and to remedy any breach thereof. The Administrator shall decide any questions or disputes or complaints arising under this Agreement, including questions of interpretation of the Agreement and claims of violations of this Agreement acting either on his own initiative or at the request of any interested person. All decisions of the Administrator shall be in writing and shall be final."

Of potentially even greater importance than this array of supervisory and adjudicating functions is the Administrator's role under paragraph "6–7" of the agreement, quoted earlier herein—namely, in seeking with the parties an agreed set of "objective rules and procedures to

---

1. The agreement defines the "open employment list" as "the list for inside work or the list for outside work, or both, as the case may be, maintained by the Union at its offices at 1322 Third Avenue, New York, N. Y., from which all workmen shall be referred to jobs with employers."

implement" the provision for "[e]qual employment opportunities," subject to determination by the court in the event of failure of such agreement.

With the concurrence of the parties in the selection, as their agreement contemplated, the court designated an Administrator in the consent decree. George Moskowitz, Esq., a seasoned labor attorney and arbitrator, has performed valiant and creative service for which the parties and the court are in his debt. The parties reflect their estimate of his value to them when, although disagreeing about many things, they join in urging that he be prevailed upon to continue as Administrator if that is at all possible for him. The court adopts their suggestion.

■■ The Administrator has tried, with some considerable success, to guide the parties, through a combination of gentle force and patient persuasion, toward effective management of the obligations detailed in their agreement. Unfortunately, however, defendant Local has displayed only measured enthusiasm for the basic objective of nondiscriminatory employment, and its key officers have both permitted and participated in the violations outlined below. The "objective rules and procedures" for which the Local had the duty of initiation remain to be formulated. And, above all, the pattern and practice of discrimination has continued. Discerning this, the Government moved on November 5, 1970, for an adjudication holding the Local in civil contempt.[2] Extensive discovery proceedings were followed by an evidentiary hearing extending over seven days. Now, upon the record thus made, and against the background already described, the court sustains the Government's main charge relating to referrals of permit holders for outside work, but

finds insufficient evidence for the other allegations of contempt.

## II.

The responsible officers of the Local understood clearly, and expressed to each other and to their membership the understanding, that the agreement and decree required prompt and significant changes in their past practices relating to outside work. With the Local's "exclusive right" under its collective bargaining agreement to refer men for jobs was now joined the responsibility to "implement and perform" the settlement agreement by seeing that the distribution of work within its jurisdiction was made in a nondiscriminatory fashion. The Union concedes in its brief that "[i]t was generally agreed by the officials of the Union, at a meeting on February 24, 1970, that until such time as the rules and procedures were settled between the parties by agreement with the Administrator, the procedure would be that all men would have to come through the hiring hall, that men in the City of New York would have to register on the open employment list, * * * and that men should not obtain employment at the job site." On June 16, 1970, after hearing complaints, the Administrator ordered that all men seeking work in the five boroughs of New York must appear personally at the Local 46 hall and sign the open employment list in order to get job referrals. As reported in the testimony of Business Manager Tierney, the officers of the Union understood that to "live up to the agreement," they could not take any requests from foremen to refer specific individuals to tie slab. The Union officers recognized that unless "shaping" (appearing and registering for work in) the hiring hall and some mode of neutral selection from those so shaping became the central technique of

2. There has been some suggestion by defendant Local that the Government's charges should be heard by the Administrator, not the court. But the consent decree provides that failures of compliance, "including breach of [the] Agreement, shall be punishable as a contempt of court." This is not to say that measures short of a contempt proceeding would not have been preferable for more than one reason. Having tried, however, and perhaps even if it had not, the Government is entitled to be here seeking enforcement of the decree.

referral, white job-seekers would continue to be preferred over minority group members, in violation of the Union's obligation.

Notwithstanding this knowledge, a variety of the practices connected with the referring and hiring of men for work—practices the Union knew of and knew were not permitted—persisted after the agreement:

(1) Many white Local 46 members and permit holders, on hundreds of occasions between May 1, 1970 and July 30, 1970, obtained outside work in the five boroughs without signing the open employment list.[3] Many white workers, with the acquiescence and the tacit blessing of the Local's officers, made their own arrangements for work, bypassing the hiring hall altogether. Not infrequently foremen called the Local's office (where the hiring hall was located) to say they were putting a white man to work at the job site. In some cases of this kind, the foremen were told to have the men come through the hall for the ritual of signing the list; in other cases not even the ritual was observed. In some cases, a white applicant would have a job arranged for him even though he was neither a member of the Local nor a permit holder, and would only thereafter acquire a permit.[4]

(2) Some Local 46 members within New York City, contrary to the plain rule the Local was obliged to enforce, telephoned business agents and were referred for work.

(3) Many whites who came to the hiring hall did not sign the list (indeed, felt no obligation to sign the list), and were nevertheless referred for work by business agents. The practice of ignoring the list, where black men seeking entry into the job market were scrupulously relying upon their place in the list as their basis for hoping they would be referred to a job, has served as an obvious, simple and blatant device to undercut the professed goal of a neutral and orderly referral system.

(4) Whether or not the list was signed, its practical effect was trivial or nil in terms of the intended goal of neutral selection for job referrals. There was not even an effort to arrange for such neutrality. Reflecting the adherence to a course of arbitrary and unregulated preferments, one business agent typified the situation when he observed that men were sent out on jobs in "[n]o particular order whatsoever."

(5) Several Local officers testified that experience is a factor used in selecting men to refer to jobs. This is true to a limited degree; it has also served, to a large extent, as a device for evasion. All too frequently the business agents have assumed that because a man was black (and unknown to them) he was inexperienced. The business agents rarely or never bothered to ask, and rarely found out, what the actual experience of such a man was. In fact, some of the blacks waiting in the hall for referrals were experienced in the work for which experience was relevant. Many white permit holders were sent to jobs though they had no experience whatever while experienced (or equally inexperi-

3. These data are shown in a computer-assisted study of union practices prepared by the Government in connection with this case. The court has examined the study and the exhibits prepared therefrom, after being informed at the hearing about the techniques of preparation, the admitted errors, and defendant Local's arguments to show unreliability. The court has concluded that the errors are trivial in number and significance; that the study is essentially sound; and that it may be, as it has been, taken as an essentially sound statistical portrayal of the facts to which it relates.

4. The classic pattern of the discriminatory official emerges from our record: the rule against hirings at the job site, winked at for whites, was strictly enforced in the rare instance when a black was offered such an opportunity. One black, offered a particularly attractive job by a foreman and then requested by the foreman, was denied the spot. The business agent told him: "You go where we send you. You don't pick your own jobs around here."

enced) blacks received no referrals or were referred to inferior jobs.

There is a deep-rooted and pervasive practice in this Union of handing out jobs on the basis of union membership, kinship, friendship and, generally, "pull." The specific tactics, practices, devices and arrangements just enumerated have amounted in practical fact to varying modes of implementing this central pattern of unlawful criteria. The hirings at the site, the bypassing of the lists, the use of the hiring hall, when it was used at all, as a formality rather than as a place for legitimate and nondiscriminatory distribution of work—all reflected the basic evil of preferring Local 46 members, relatives, friends or friends of friends in job referrals. And since the membership of this Local has for so long been almost exclusively white, the result could have been forecast: the jobs, and especially the more desirable jobs, have gone disproportionately to whites rather than blacks.

Because courts may know what all the world knows, practices of nepotism and favoritism like those disclosed here could, and probably should, be condemned as in-

evitably discriminatory *per se*. See, e. g., Local 53 of Int. Ass'n of Heat & Frost I. & A. Wkrs. v. Vogler, 407 F.2d 1047, 1054 (5th Cir. 1969), and citations there; United States v. Sheet Metal Wkrs., Int. Ass'n, Local U. No. 36, 416 F.2d 123, 139 (8th Cir. 1969); Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1147, 1150–51 (1971); Friendly, The Dartmouth College Case and the Public-Private Penumbra 23 (1968); cf. Turner v. Fouche, 396 U.S. 346, 360, 90 S.Ct. 532, 24 L.Ed. 2d 567 (1970) (jury lists). But there is no need in this case even for so modest a generalization. The whole story is here, in vivid and repetitive detail. Giving life and point to an impressive statistical demonstration,[5] the Government has shown in case after case the preference of whites over blacks on grounds of nepotism or acquaintanceship. The officers of the Local did not merely acquiesce in this state of affairs; many if not all, of them, have been active participants in the pattern of favoritism and its inevitable concomitant, racial discrimination.

5. The Government's computer study, although not free of errors (see note 3 *supra*), shows the discriminatory effects in an overwhelming fashion. With respect to average wages earned during March through July 1970, there is a substantial difference in average earnings between white and black permit holders, whether one compares average earnings of all black permit holders and all white permit holders or similarly situated subgroups within each category. Substantial earning disparities between the races are also reflected in the statistics for other categories of workers within the Union's jurisdiction. Defendant's own hastily prepared and brief counter-study likewise shows that for all permit holders issued permits during March-July the earnings of whites far exceeded those of nonwhites.

There is also clear evidence from the Government study that black permit men had to work far harder at getting work than did white permit men. In order to get less work than the whites, they had to shape the hall far more frequently. Of the group of men issued permits in May or June 1970, 87.6% of the blacks

shaped the hiring hall during the period of the computer study, whereas only 45.8% of the whites shaped the hall; in addition, the blacks shaped the hall more frequently per man than the whites. But even with the blacks' extra effort and persistence, 36.7% of the white permit holders received work from the hiring hall and elsewhere, as compared with 30.7% of the blacks. Of those who sought work in the hiring hall 80% of the whites, but only 35% of the blacks, received employment. The average number of shapeups per man for the permit men who actually received work was several times higher for blacks than for whites. The special analysis of the records of men who received permits in May and June 1970 shows 93 instances where whites obtained jobs without signing the hiring hall list (most of these were within New York City). There was only one such instance involving a black. In sum, this part of the computer study shows that many whites never used the hiring hall to obtain employment, and those who did were vastly preferred over blacks in referrals to jobs.

Perhaps the most striking single category is that of students who were granted permits by the Local during the usually peak summer season to earn their expense money for school. Several white students testified that, through friends or relatives who were in the Union or who knew people who were, summer jobs were arranged. They were put to work by foremen or deputy foremen, who usually sponsored their work permits, and who, at least in some cases, called the hall to "request" them.[6] These referrals enabled some white students to earn thousands of dollars during the summer of 1970, while black students shaped the hall and were not referred, or suffered long delays before being referred, or were referred to jobs of short duration.

The Union's officers have attempted to explain partially the infrequent referral of black students by recalling the uncharacteristic slowdown of work last summer.[7] But the attempted explanation is a failure. The record indicates what we would expect: that in periods of few employment opportunities, the discriminatory impact of nepotism is most pronounced.

The defendant has also seemed to suggest, though not with abundant conviction, that differences in work experience may help to explain the apparent favoritism. But all or most of the young college men, whatever their skin color, were alike both in lacking experience and in being endowed with the ability to learn in a few hours most kinds of outside work assignments. In fact, some of the most impressive testimony on this subject came from favored white youths who were inexperienced, had been referred to jobs, and readily acknowledged that the intellectual demands of the job were slim and speedily mastered.

Beyond the cases of college students, the proof has shown the widespread deprivation to which older men, often with families to support, were subjected by defendant Local's discriminatory practices. Numerous blacks, often with substantial, relevant work experience, vainly shaped the hall day after day during the summer months, at a time when inexperienced students, other inexperienced white men and similarly situated whites got jobs through people they knew.

The "hardest" evidence in the record may be the combination of statistics and accumulated reports by witnesses showing specific cases of favoritism for whites and discrimination against blacks. But there are matters less quantifiable and less objective in appearance that give point and substance to the whole dreary picture. The attitude of witnesses, the bland show of innocence, the forgetfulness about things that ought to be remembered, the occasional revelations of explicitly racist sentiment, the refusal of one agent to sign the settlement agreement to enforce a regime of nondiscrimination because he thought it was "rammed down the union's throat by the government," the evidence of special and focused nastiness to black men in the hiring hall—such things betray a broad undercurrent of hostility to the decree and the commands of the law giving rise to it. Not surprisingly, and not unrelatedly, there is evidence of casual neglect, minimized in the Local's brief as mere "sloppiness," in complying with even the mechanical obligations under the court's decree. Copies of the settlement agreement were to be mailed to

6. There was some vague evidence to the effect that the Administrator had directed that any cases of requests by foremen for specific individuals be noted on the employment sheets. We are not told why he requested this or what he planned to do with the sheets once marked. In any event, the Union people failed to comply with the order. There is nothing in the record to suggest that the Administrator was permitting or validating referral practices which had racially discriminatory effects. As we see from the record, the routine granting of foremen's requests was one way discrimination continued.

7. The Local's business manager reported that the summer of 1970 was so slow that the sons of one of his cousins found work for only part of that season !

the membership; but many remained undelivered, with no apparent effort made to take obvious follow-up measures to effect delivery. The copy of the settlement agreement as reproduced and distributed had underlined words limiting the Local's obligation not to discriminate—namely, the clause saying, after the provision in paragraph "6–7" for equality in referrals: "except that experience in the trade may be used as a basis for preference if it relates to the ability of the workmen to perform the work required.[8] Copies of the decree, also required to be distributed, were never sent out at all. In general, there was no earnest and effective effort to notify those affected of the changed rules governing job referrals. Professed reliance upon the "grapevine" was characteristic of the officers' indifference (at best) to the duty of meaningful compliance.

Of a piece with the course of passive resistance and inaction was the defendant Local's performance of its obligation under the settlement agreement to "develop and present to the Administrator and the USA" within six months "objective rules and procedures to implement" the broad provision for "[e]qual employment opportunities." The Local managed to present a set of such rules and procedures exactly six months after execution of the agreement. The product so long in gestation was trivial and superficial. For the most part, it simply parroted the terms of the agreement itself or announced specific provisions that had been obvious from the outset. No effort was made to cope with or cure the basic evils of using union membership, friendship and kinship as criteria of job referral. Government counsel responded to the union's proposal by a show of despair and disgust. The proposal was deemed, understandably, to supply no beginning-point for useful negotiations. Instead, the Government proceeded toward the instant contempt proceeding.

Defendant Local has attempted to erect as a shield its own tardiness and inadequacy in particularizing rules and procedures for compliance. There is a suggestion that the Local may not be found in contempt because the details of its obligations remained uncertain. The suggestion is not meritorious. For reasons already reviewed, the practices of the Local would probably be found unlawful even if this were an initial adjudication rather than a contempt proceeding. Passing that, however, the proof establishes compellingly that the officers of the Local knew and deliberately neglected the measures—in sum, genuine use of the hiring hall and the employment lists rather than personal contact with friends and relations—required to comply with the obligation to avoid racial discrimination in referrals.

This is not to say that the performance of the Government in this aspect of the proceeding has been entirely satisfactory. It was contemplated under the decree and the agreement that the Government would act affirmatively to promote prompt and adequate measures of compliance. It may well be that stronger and earlier pressure should have been exerted to compel the timelier presentation by the Local of more meaningful working proposals. It is also possible to speculate with hindsight that the Administrator, seeking to promote harmony and a spirit of voluntary cooperation, may have been more patient than any of the parties had a right to expect.

What emerges none the less clearly for now is that there were no actions or inactions by others that excuse or explain away the violations by the Local of its obligations respecting referrals of permit holders for outside work. On this main point of its motion the Government has prevailed. A decree will issue holding the Local in contempt in this respect, awarding back pay to be hereafter assessed, and providing other appropriate relief.

8. There was an "explanation" offered for this. Given full weight, which it probably does not merit, it is unimpressive.

### III.

■ The Government urges that the Local should be held in contempt in other respects. While these remaining claims are not unsubstantial, the court concludes that they are not sustained by a preponderance of the evidence, let alone by the higher quantum the Government is required to have presented. See Hart Schaffner & Marx v. Alexander's Dept. Stores, Inc., 341 F.2d 101, 102 (2d Cir. 1965).

A. It is claimed that the settlement agreement and decree have been violated in that members of Local 46 have received preferences in assignment of overtime work. The statistics do show that members have worked strikingly larger amounts of overtime hours in relation to straight-time hours than have nonmembers. It is also shown that the disparity has been declining in recent months. The main point here, however, is that the figures alone, though they may ground more than a faint suspicion, are not sufficient to prove the claim of forbidden discrimination. Jobs vary in the construction industry. The composition of crews and the distribution of men on jobs prior to the decree may account for the difference in the period after the decree. What *does* account for the difference has not been shown. There is no proof of complaints by the alleged victims of discrimination, no evidence that nonmembers of Local 46 were ever "bumped" after the ordinary work day to favor members in overtime assignments, and no proof that the subject of overtime has even been explored with the Administrator. There is, in short, no concrete suggestion by the Government as to how or when the specific provision in the settlement agreement relating to overtime [9] may have been violated.

B. The Government claims a further violation in the continued practice, which is not disputed, of confining foremen's positions to Local 46 members. But it does not appear that this arrangement was meant to be outlawed by the consent decree. A basic premise of the settlement agreement was the Local's "exclusive right to refer men for employment" and to require employers to fill jobs by requests for such referrals. Neither the language of the agreement nor the things the court may opine about labor practices would compel a conclusion that this embraced or embraces management's selection of foremen. What evidence there is touching the point indicates that the referral system does not cover foremen. But whatever the fact may be, the agreement is not aptly worded to cover this subject. The Government has offered no basis for concluding that the general term used in the agreement, "workmen," was meant to include foremen.[10]

C. The continued practice by Local 46 of refusing transfers from other locals has not been shown to violate the decree. It is not demonstrated that the other locals have such appreciably higher percentages of nonwhite members as to bring this practice within the scope of the evil at which the governing statute, the agreement and the decree are aimed. Nor is there proof that racial discrimination has ever been or is now the motive for the restrictive transfer policy.

D. The defendant Joint Apprenticeship Committee recently announced, but then canceled, a proposed new class of apprentices. The circumstances suggest that the explanation for the change of plans could very possibly include the defendant Local's lack of zeal for the goal of racial equality. On balance, however, the claim of contempt in this respect is

9. "Overtime shall be divided equally among the gang on the job doing the particular work involved. In cases where this division of overtime is impractical, an exception can be made for good reason given." Par. 8.

10. Compare the separation of "employees" from "supervisors" under the definitions in § 2 of the amended National Labor Relations Act, 29 U.S.C. § 152(3) and (11), where a hallmark of the latter category is the power to hire, possessed in evident substance by the foremen here.

not sustained. Defendants are not required by the agreement, and the court will not order, the scheduling of a new apprenticeship class.

## IV.

The problem of remedy and of measures to promote more effective enforcement in the future presents a number of sticky questions. On some of these the court is prepared to rule finally at this time. On others, while the broad outlines can be stated, further deliberation with counsel will be necessary before the details of a decree can be formulated. The court's conclusions at this stage on the several subjects under this last heading are as follows:

■ A. *The Administrator.*—As has been indicated, all of us are agreed that the valuable efforts of Mr. Moskowitz should be continued. There is some dispute over the Government's suggestion that his powers be specified in greater detail and that he be authorized specifically "to award monetary damages and costs in aid of his decisions." The court agrees in general with the position of defendant Local that the sweeping definition of the Administrator's powers in the agreement as it stands is adequate to the ends sought. He has authority to "ensure * * * performance * * * and to remedy any breach," to "decide any questions or disputes * * *, including questions of interpretation * * and violations" of the agreement. That seems ample already for any fairly conceivable need, including the need, if it arises, to adjudge that a suitable "remedy" must include damages and costs. The court has no doubt that the experience ending in this unfortunate contempt proceeding will be sufficient without more to supply guidance for the Administrator in judging to what degree, and for how long, he may have to favor the

stick over the carrot as the instrument for promoting compliance.

In only one respect, because of the demands of the instant proceeding and the problems underlying it, the court is compelled to burden the Administrator with a directive and a deadline. The fashioning of implementing "rules and procedures" under paragraph "6–7" of the agreement has been discussed already. This basic work remains undone. With the learning marshaled for this contempt proceeding, both sides should be ready to move promptly on this front. Accordingly, it is now ordered that within twenty days from today, the parties will exchange and file with the Administrator proposed sets of rules and procedures, setting forth in precise detail a scheme for fair and neutral referrals from the hiring hall.[11] It may be hoped by now that words like "fair" and "neutral" convey a message entirely intelligible in our context for readers bent upon understanding and acting in good faith. It should be unnecessary to specify that subjective criteria—like estimates of "ability" by union business agents or even "work experience" in terms other than purely temporal [12]—should be eliminated entirely, or at least as nearly as possible. All must understand now that the interests of everyone, not least defendant Local, are in a last opportunity to prescribe rules that are fairly workable by the incumbent union officials, fairly and objectively checkable by those affected or charged with scrutiny and thus sufficient to obviate any question of installing official supervision from the outside.

Within five days after receipt of the respective drafts the Administrator will commence meetings with the parties seeking agreement upon the rules and procedures. The objective will be a conclusion of this effort on or before June

---

11. This order is addressed directly to the parties before the court in this contempt proceeding. It is not meant, however, to exclude others. The Association representing the employers is entitled to present views that protect its members'

legitimate interests while furthering the essential ends in view.

12. Both of these having been listed in the sketchy draft tendered by the defendant Local in August 1970.

28, 1971. Not later than that day, the Administrator will submit to the court either the agreed statement of rules and procedures or, if that has not been achieved, a set proposed by him for adoption and enforcement. If the latter should prove necessary, the parties will exchange and submit to the court, on or before July 6, 1971, their respective objections to the Administrator's proposal. In that event, the matter will be set for hearing beginning 10 a. m. July 12, 1971, and resolution as speedily as possible thereafter.[13]

■ B. *Compensatory back pay.*— The controlling statute provides that in suits like this one, brought by him in the name of the United States, the Attorney General may seek "such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described." Civil Rights Act of 1964, § 707(a), 42 U.S.C. § 2000e-6(a). There seems to be no reason to doubt that under this broad authorization the Government could seek as initial relief in an appropriate case, and the court could grant, compensatory lost pay to victims of forbidden discrimination. But

if that could be questioned, and if there may be reasons to move slowly in demanding such relief, see Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1243–44 (1971), it seems evident that compensatory back pay is an apt remedy for violations of the court's decree. Cf. N. L. R. B. v. Remington Rand, Inc., 130 F.2d 919, 928, 936 (2d Cir. 1942).[14] It is not less evident that this is a proper case for such relief.

The court holds, then, that those black permit holders deprived of outside work because of the unlawful and contumacious practices found in this proceeding are to be made whole by awards of pay from defendant Local sufficient to make up the difference between what they earned (whether in such outside work or elsewhere) and what they would have earned but for such unlawful discrimination. The individual awards to be made hereunder will be determined in the first instance by a special master—to be named if possible from a list of persons agreeable to both sides, to be compensated by defendant Local, and to conduct his hearings and make his report under guidelines that will be evolved in the near future following a further hearing of the parties to be scheduled for that

13. The conclusions of the court concerning the development of rules and procedures will resolve the dispute over the Government's proposal that a decree should be entered now requiring a system of "first in-first out" as the mode of handling referrals from the hiring hall. The difficulties with this seemingly simple solution—not least the prospect of early-morning riots at Union headquarters—are indicated in persuasive detail by defendant Local. It is obvious, moreover, that if this could be thought to be a genuinely workable arrangement, the Government would have been remarkably derelict in the period of well over a year since the consent decree. At any rate, the court cannot deem it an acceptable remedy to resolve the complexities and the legitimate differences among the job-seekers by merely decreeing their nonexistence.

14. Defendant Local argues that back pay is unavailable because the "United

States" does not seek the money for itself, distinguishing the case just cited on the ground that the National Labor Relations Act specifically empowers the Board to award back pay. Apart from the fact that *Remington Rand* decreed "compensatory fines" for the contempt (*id.* at 936) rather than merely enforcing an administrative order, this distinction does not seem cogent. The broad remedial powers of the court under the Title here in question seem sufficient to achieve the patently sensible remedy of repairing the forbidden monetary injury. The Title as a whole contemplates complementary rights of suit by the individual, aided by the Government where necessary, and by the Government directly. Without laboring the subject, the separation defendant proposes between the class of those to be protected and the Government as protector seems artificial and pointless.

purpose. Such a hearing seems necessary and desirable so that the court may have the focused views and guidance of counsel on the criteria for measuring back pay. In the briefs thus far submitted, the Government has suggested an array of possibilities, none of which seems compellingly suitable. Defendant Local, concentrating its fire on the prior objective of avoiding any finding of contempt at all, has not dealt in detail with the dread question of how damages, if they were awarded, should be computed. Both sides, the court and, not least of all, the ultimate individual beneficiaries are entitled to have this somewhat involved subject explored more fully than it has been thus far.

Accordingly, not later than May 26, 1971, counsel will submit memoranda on this problem. Within the week thereafter, the court will hear argument. Prior to the date of argument, counsel are to confer and submit an agreed list of six (6) names of candidates for the role of special master.[15]

In the meantime, merely as tentative guides, a few thoughts as to the possible bases for computing back pay may be noted:

(1) The affected permit holders should probably be divided into at least two categories at the outset: the students seeking summer work and others.

(2) Further classifications should be considered in terms of length and nature of the individual's work experience.

(3) Within each classification, it may be that awards must be computed by distinct periods, possibly of one month each, with eligibility to be determined on the basis of some minimum number of days of (a) work, (b) appearances at the hiring hall or (c) a combination of the two.

(4) The amounts actually earned by those found eligible should perhaps be measured against average earnings during the same periods for white outside workers in comparable classifications, with awards to be comprised of the difference between such averages and the lesser amounts earned by individual claimants.

These suggestions differ from the possibilities outlined by government counsel. It may be that the latter, or some different alternative, will prove preferable in the end. And, of course, nothing said tentatively here is meant to discourage consultative efforts by the parties, perhaps with the informal assistance of the Administrator, to evolve an agreed basis for fair and expeditious determinations.

■ C. *Costs.*—The Government seeks as costs $10,000 for its computer study [16] plus unspecified amounts for attorneys' fees and other litigation expenses. While defendant Local has been found to be the clear and sole wrongdoer, and while the power to award costs is not seriously questioned, the court arrives at a compromise result on this question.

The court considers in this regard that the Local has already incurred, and continues to incur, substantial expenses for study and improvement of the record-keeping arrangements in its hiring hall. The Local also faces substantial financial burdens in the proceedings to determine, and then in the payment of, compensatory awards for lost pay. The sovereign, given its public role not only as party to the agreement but as representative of all those affected, will be adequately compensated in this case if it receives less than every dollar it might plausibly demand as a litigant.

Taking everything together, the court concludes it will be fair and equitable to require that the Local pay half, $5,000,

---

15. The theoretical difficulty in such a direction is recognized, but without deep concern. Counsel in this case have demonstrated their ability to collaborate effectively on an assignment of this kind.

It is not imaginable that the court will have occasion to learn of a failure in this instance and to inquire as to what was done by whom to avoid such a failure.

16. See notes 3 and 5 *supra.*

of the cost of the computer study.[17] The order to be entered after the further proceedings now directed will so provide.

To conclude: The directions given in this opinion for further proceedings—to evolve rules and procedures and to move toward computation by a special master of compensatory back pay—are interim orders of the court. In the course of those proceedings such additional order or orders will be entered as may be necessary to dispose finally of the Government's motion.

## SUPPLEMENTAL OPINION

Counsel and the court have studied together the problems concerning compensatory back pay left open in the decision of May 12, 1971. The results of these efforts are as follows:

1. We have all been made aware that the task of fairly determining eligibility for, and amounts of, compensatory pay awards is somewhat more complex here than it is in the relatively standard case of unlawful discharges or refusals to hire. The record shows substantially less than total exclusion of nonwhites from the jobs controlled by defendant Local. But it shows severe discrimination against nonwhites resulting in (a) a sharply larger proportion of nonwhites receiving no work at all and (b) substantially less work for the nonwhites than for the whites viewed as groups. From this general picture of the two categories viewed *en bloc*, it has been necessary to proceed to more particularized judgments for the purpose of seeking criteria that will serve fairly and reasonably to determine individual damage awards. It has been a central purpose to strike a balance that would avoid both the granting of unjust windfalls at the Local's expense and the exclusion of deserving claimants under exclusively "objective" criteria which would fail in fact to embrace most or much of the damage actually suffered through the Local's unlawful course of racial discrimination. It will be necessary, of course, if this balance is to be achieved, to rely upon discriminating judgments by the Special Master, at least in the first instance, as he appraises individual circumstances yet to be unfolded.

More specifically, the court concludes that in order to establish eligibility for any award of back pay, a claimant must prove as a first step a sufficient investment of time and effort to show that he was ready, willing and available to take work on referrals from the Local. Having re-examined the evidence for this purpose, the court holds that a claimant will be eligible for back pay in any month during which he either (a) shaped the hiring hall for five or more days or (b) shaped the hall and/or worked on a job or jobs for a total of eight or more days. These categories are referred to hereinafter as the "objective criteria."

The period of potential back-pay awards under the present decision will extend from February 25, 1970, the date of the consent decree, to November 5, 1970, the date of the Government's contempt motion.[1] There are sound reasons for not requiring satisfaction of the

---

17. No question has been raised about the total of $10,000 reported by government counsel. The Local's criticisms of the study have been mentioned earlier, and rejected.

1. The Government has argued for a longer period, extending to February 8, 1971, when our evidentiary hearing commenced. The Union, originally urging the shorter period of "peak employment," moved during discussion to the one now fixed. There are no mechanically decisive arguments for this final ruling. It rests, however, upon considerations of fairness and practicality. The evidence in the record, with trivial exceptions, relates to events mostly earlier than, rarely later than, the November 5 date. The Local, summoned to defend against contempt charges, had a right to limit its defense to the evidence adduced against it. The inauguration (and proof) of substantial changes in its practices after filing of the contempt motion presented problems of large dimensions. And, on a comfortingly practical level, it is probable that the time from November 5 to February 8 was one of relatively little outside work for everyone, black or white.

objective criteria as an indispensable condition of eligibility for every month of this period. A claimant who shaped the hall for five or more days in any one month and obtained no referral may be able to prove, from this experience and other circumstances (e. g., observations in the hiring hall, reports from other affected persons, and statements by union representatives), that his failure to shape as much (or at all) in subsequent months rested upon a well-founded conviction that further appearances at the hall would not result in referrals for him or would result in referrals so rare and undesirable that his economic needs would be better served by his seeking and finding employment elsewhere. A similar showing may be possible for a claimant who met the objective criteria in at least one month by shaping and/or working a total of at least eight days. In cases of either type, the claimant who has met the objective criteria for at least one month may show, in other words, that his treatment by the Local was so notably exclusionary and discriminatory as to amount in practical effect to a substantial denial of employment. In such cases, the claimant, provided he sought or obtained employment elsewhere, will be eligible for back pay for some or all of the additional months beyond the one or ones in which he meets the objective criteria. On the other hand, of course, a claimant who ceased shaping the hall because he chose to work in some preferred place or because he chose not to work at all (e. g., upon returning to school) may not be deemed to have been "ready, willing and available," and thus eligible for compensatory pay, beyond the month or months in which he meets the objective criteria.

To summarize on this subject, a claimant will be eligible for back pay

(a) for any month or months in which he meets the objective criteria, and

(b) once having met those criteria in at least one month, for any additional months in which he can prove that he was ready, willing and available to take outside work under the Local's jurisdiction but worked or sought work elsewhere because of a well-founded conviction that this course properly served his interests in light of defendant Local's discriminatory handling of referrals.

2. Eligibility will be determined and back pay, if any, will be computed on a monthly basis, except that the first period for this purpose will extend from February 25 through March 31, 1970, and the eighth and last period from October 1 through November 5, 1970. Cf. National Labor Relations Board v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953).[2]

3. For any month of eligibility a claimant is to receive the difference, if any, between average earnings of white union members performing outside work (excluding foremen and deputy foremen for any month of service as such) and permit holders, on the one hand, and the lesser amount the claimant earned or should have earned.[3] This measure and its components require some elaboration:

(a) Average earnings of white union members and permit holders will

---

2. The lengthened initial and final periods, serving the end of administrative convenience, may benefit a couple of claimants, if any (the matter has not been checked), by enabling them to meet the objective criteria which they could not otherwise satisfy. The scale is sufficiently balanced, however, when we note that these periods come at times of relatively low employment levels.

3. The parties have agreed to work together to compute (and, if possible, largely to stipulate) the average earnings of white union members and permit holders for each period. In addition, the parties plan to prepare a questionnaire eliciting the basic facts asserted by all nonwhites claiming eligibility for back pay. These cooperative efforts give promise of keeping the proceedings before the Special Master within manageable bounds. For this and other instances of good professional judgment the court is grateful to counsel on both sides.

be based in each period upon the total earnings of all such individuals (divided, naturally, by their number) who either (i) shaped the hall for at least five days or (ii) shaped the hall and/or worked for at least eight days.[4]

(b) From the average thus derived, for each claimant eligible in the particular period, there will be deducted (i) the claimant's actual earnings for the period and (ii) amounts, if any, that the claimant could reasonably have earned but for failure to take other work. Defendant will have the burden of proof on (ii).

4. Bernard D. Fischman, Esq., upon the parties' suggestion adopted by the court, will serve as Special Master to hear the claims for compensatory back pay and render findings and conclusions thereon.

The foregoing directions are orders of the court. No settlement is necessary.

---

4. These correspond, of course, to the objective criteria for the nonwhites. There is no need for any additional category of white workers; they suffered no discrimination of the kind for which such a category has been defined in the case of the nonwhites.