471 F.2d 408
 5 Fair Empl.Prac.Cas. 318, 5 Empl. Prac. Dec. P 8104
UNITED STATES of America, Appellee,
v.
WOOD, WIRE AND METAL LATHERS INTERNATIONAL UNION, LOCAL
UNION NO. 46 and The Joint Apprenticeship Committee of the
Employing Metallic Furring and Lathing Association of New
York and Local Union No. 46 of the Wood, Wire and Metal
Lathers International Union, Appellants.
 No. 154, Docket 72-1345.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 13, 1972.
Decided Jan. 2, 1973.
 
 Joseph P. Hoey, New York City (Amen, Weisman & Butler, New York City, Robert L. Ellis, New York City, of counsel) and Doran, Colleran, O'Hara & Dunne, New York City, Walter M. Colleran, New York City of counsel, for appellants.
 Joel B. Harris, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., for the S. D. N. Y., of counsel), for appellee.
 Before SMITH, KAUFMAN and MULLIGAN, Circuit Judges.
 SMITH, Circuit Judge:
 
 
 1
 Defendant-appellants Wood, Wire and Metal Lathers International Union, Local Union No. 46 and Joint Apprenticeship Committee of the Employing Metallic Furring and Lathing Association, (JAC), appeal from an order and an amended order of the United States District Court for the Southern District of New York, Marvin E. Frankel, Judge, 341 F.Supp. 694, requiring Local 46 to take certain affirmative actions to remedy the effects of past discriminatory practices and to provide equal opportunity to non-white workers. We find no error and affirm the orders.
 
 
 2
 The United States filed suit against the union and JAC in 1968 under Title VII of the Civil Rights Act of 1964 to enjoin a pattern and practice of discrimination by Local 46 and JAC. Local 46 is a labor organization having exclusive jurisdiction over two types of construction work in New York City and its suburbs: metallic lathing and furring ("inside work"), which is performed by apprentices and members of Local 46; and concrete reinforcing ("outside work"), which requires none of the skills taught in the apprenticeship program and is, therefore, performed by permit holders as well as union members. Permit holders are workers who pay dues to Local 46 for the privilege of using the union's hiring hall to obtain work referrals. They are not union members, have not been apprenticed, and perform only outside work. Discrimination was charged in work referrals. Just prior to trial, after eighteen months of discovery, defendants entered into a settlement agreement which became the basis of a consent decree entered by the district court.
 
 
 3
 ". . . [I]ntended to ensure the full enjoyment by Negroes of the rights to equal employment opportunities . . . secured by Title VII," the agreement provided for an administrator, empowered to take all actions necessary for its implementation and to remedy any breach. The administrator was also charged with making an objective study of the work permit system and recommending any changes deemed necessary to attain the goal of equal employment opportunity. Such changes were to be effected either by consent of the parties or court approval and order of enforcement. It is from the court's approval and order of enforcement of the administrator's study and recommendations, and his order to reissue 100 work permits, that the union appeals.
 
 
 4
 Local 46 contends that under Sec. 2000e-2(j) of Title 42 neither the administrator nor the court could require that the union grant permits on a given racial quota or issue 100 permits immediately to minority applicants. The union further contends that the administrator's order to issue 100 permits and his use of national and state statistics in his study were not within the scope of his authority under the agreement. Finally it is argued that the failure to hold an evidentiary hearing on the permit system, and the lack of a written evidentiary record, denied the union due process of law. For the reasons below, we find no merit in appellants' contentions.
 
 
 5
 Despite Title VII's directive that cases of this type be expedited in every way, 42 U.S.C. Sec. 2000e-6(b), this case has been before the courts for four and one-half years. No small part of this delay has been due to the union's "course of passive resistance and inaction" the result of which has been a continuing discrimination against non-white workers at least two years after its agreement to afford equal treatment to blacks. United States v. Wood, Wire and Metal Lathers, 328 F.Supp. 429 (S.D.N.Y.1971).
 
 
 6
 Under the settlement agreement, the union agreed to develop objective rules and procedures to implement fair and equal hiring hall procedures. These rules were to be drawn up within six months of the effective date of the agreement. Precisely six months after the agreement, Local 46 presented the government and the court with "a trivial and superficial" plan which was totally useless. During the time the plan was being developed the union, for the first time in its history, ceased issuing work permits.[1]
 
 
 7
 Upon receipt of the union's proposed hiring hall procedures, the government moved to hold the union in contempt for breach of the agreement.[2] Finding that the objective rules and procedures remained to be formulated, that the union had operated its hiring hall subsequent to the agreement so as to discriminate against blacks,[3] and that "above all the pattern and practice of discrimination [had] continued," the court held the union in contempt for violation of its obligation respecting referral of permit holders for outside work.[4] Local 46 was ordered to restore "back pay to black permit holders deprived of outside work because of unlawful and contumacious practices." Development of fair and neutral hiring hall procedures was turned over to the administrator.[5]
 
 
 8
 Proposed hiring hall procedures were submitted to the court by June 28, 1971 and approved in August. Local 46 filed its first monitoring report, required by the new rules, in September. The master eligibility list showed a decrease in the number of non-white permit holders, from 170 (prior to the closing of the permit window) to 72. Charging that the drastic decrease was due in large part to the effect of the discriminatory referral practices on the ability of nonwhites to obtain jobs through the hiring hall, and the freeze on permits, the government immediately requested the administrator to order the union to issue 100 permits to non-whites and to allow renewal of permits by previous holders without having to pay back dues.
 
 
 9
 The administrator so ordered. Refusing to read the agreement to foreclose remedial action designed to overcome existing or continued evils when discovered, he provided for the issuance of the permits "to restore the number of nonwhite permit holders back to the level reached prior to the Union's act of 'closing the permit window."' Local 46 appealed his order to the district court claiming the administrator had exceeded his authority.
 
 
 10
 Ten days later, the administrator submitted his study of the job referral system and his recommended changes. Premising his study on three goals (1) to redress the effects of past exclusionary practices, (2) to provide equal opportunity of employment to all present and future applicants for work in the industry within the jurisdiction of the union, (3) to achieve these goals without adversely affecting the present work force, the administrator recommended that the union issue at least 250 permits annually through 1975 on a one-to-one ratio, black to white.[6] The number of permits issued according to the proposal would have to achieve within certain percentage ranges an increasing representation of minority workers in the permit holder group. Thus by 1975, non-whites holding permits would equal the percentage of blacks who would have been issued permits but for the past discrimination.[7]
 
 
 11
 Local 46 and JAC refused to consent to the implementation of the study's recommendations claiming that work requirements of the industry were severely depressed and 250 new workers could not be absorbed annually. After reviewing the study and comments, the union's objections and other affidavits submitted by the parties, Judge Frankel approved the study's recommendation and the order to issue a hundred permits immediately to non-white workers. His findings were published after a refusal to grant a stay pending appeal of his order.
 
 
 12
 Appellants set up 42 U.S.C. Sec. 2000e-2(j) as a bar to implementation of the study.[8] Under the provisions of the settlement agreement, the administrator was required to make a study of the issues relating to the issuance of work permits based upon the needs of the industry, and to recommend those changes deemed advisable in the system for issuance of permits. The factors to be considered included "total number of work permits to be issued, the number of permits to be issued from time to time, and the manner of issuance. . . ." Consistent with this responsibility, the administrator, after study of the industry, found that to remedy past effects of the union's discrimination and to effect equal opportunity, permits to be issued from time to time should number at least 250 annually, and that the manner of issuance ought at least, until 1975, to be on a one-to-one basis-black to white. Clearly, the recommendations were within the scope of the agreement. Having agreed to be bound by changes suggested in the report, either consented to or approved by the court, Local 46 cannot now raise Sec. 2000e-2(j) as a bar to the study's implementation.
 
 
 13
 Nor do these changes do violence to the intent of the Act. Under the Act the courts have been vested with broad power to grant affirmative relief to combat the invidious and often subtle practices of discrimination.[9] In addition, the Act empowers the attorney general, with reasonable cause to believe that a person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any rights secured by Title VII, to request "such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice as he deems necessary to insure the full enjoyment of the rights [under Title VII] . . . ." 42 U.S.C. Sec. 2000e-6(a). The only limitation on the broad powers of affirmative relief is that restricting preferential quota hiring.
 
 
 14
 However, while quotas merely to attain racial balance are forbidden, quotas to correct past discriminatory practices are not. See Carter v. Gallagher, 452 F.2d 315, 329 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); Contractors Association of Eastern Pennsylvania v. Secretary of Labor, 442 F.2d 159, 173 n. 47 (3rd Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); United States v. Ironworkers, Local 86, 443 F.2d 544, 553 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L. Ed.2d 367 (1971); United States v. International Brotherhood of Electrical Workers, No. 38, 428 F.2d 144, 149 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); Local 53 of International Association of Heat & Frost I. & A. Workers v. Vogler, 407 F.2d 1047, 1052 (5th Cir. 1969); United States v. Central Motor Lines, Inc., 325 F.Supp. 478 (W.D.N.C.1970). As the Court expressed the principle in a voting rights case, "[t]he court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965).
 
 
 15
 There is no lack of evidence of past discrimination in Local 46's policies and practices. A finding of discrimination implicit in the order approving the administrator and granting him powers under the consent decree was made explicit in the court's contempt findings and order of implementation of the study's recommendations.[10] Appellants themselves acknowledged the fact of past discrimination, in their agreement with the government that was the basis of the consent decree. The union and United States agreed that the administrator would remain for at least three years and then until ". . . such time as the Court shall determine under all the circumstances of the case, that it is unnecessary to continue the Administrator in office, i.e. that in the absence of the Administrator it is reasonably certain that there will not be reestablished any pattern or practice of resistance to the full enjoyment by Negroes of equal employment opportunities and any discrimination against Negroes."[11]
 
 
 16
 Requiring that the union grant a certain percentage of permits to non-whites on a one-to-one basis with whites is not without precedent.[12]
 
 
 17
 Admittedly requiring that the union issue a certain minimum number of permits is a sweeping use of the court's broad power under the Act; it is compelled, however, by Local 46's actions in this case. As the experience from June, 1970-September, 1971 demonstrated, Local 46, by ceasing to issue permits, can effectively close the area of work to the vast majority of non-white laborers, without engaging in any overt discrimination.[13] Cf. Local 53 of International Association of Heat & Frost I. & A. Workers v. Vogler, supra. Subject to review and revision in light of changed circumstances, the requirement presents little danger of layoffs or other adverse effects on the ability of those already holding permits. The rights of the union to protect incumbent workers was recognized and made central to the administrator's proposal. See Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972). The 250 permits provided for represent only anticipated new job openings.
 
 
 18
 Appellant contends that the administrator's study based on national and state statistics was neither within the authority granted by the agreement to conduct a study of the industry-"industry" confined to metal furring and lathing, and concrete reinforcing industry within the geographic jurisdiction of the local, nor was the data relevant to the industry. In light of appellants' failure to offer better data, we find nothing wrong in the administrator's use of national attrition rates, used by the labor department in the revised Philadelphia Plan, and the New York State Department of Labor's construction industry growth figures.
 
 
 19
 Local 46 further contends that as a matter of elementary fairness it was entitled to a plenary evidentiary hearing to afford it the opportunity to prove the depressed condition of the industry and the unreasonableness of the recommendations. Due process does not require formal evidentiary hearing in all cases. Boddie v. Connecticut, 401 U.S. 371, 378-379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Cafeteria and Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). See Escalera v. New York City Housing Authority, 425 F.2d 853, 863 (2d Cir.), cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed. 2d 91 (1970).
 
 
 20
 Appellants cannot seriously deny that they had been fully advised of the study's findings and that they had been given substantial opportunity to be heard. Their objections were considered and answered by both the administrator and the court. In comments issued after the union's objections were filed, the administrator addressed himself to each of the local's objections and suggested that the union had failed to show how a sounder result could be obtained.[14]
 
 
 21
 The procedure followed by the administrator fully comports with the agreement's directive to conduct a study and make recommendations. Nothing in the agreement's provisions suggests any intent on the part of the parties to require any formal evidence gathering process. Apparently the union felt at the time of agreement, that the necessity of court approval or consent of the parties was sufficient safeguard against arbitrary action by the administrator.
 
 
 22
 The union suffered no unfairness, in a constitutional or common sense, because of the absence of a formal fact-finding hearing. This is especially true, where, as in this case, action adverse to the defendant could not be taken until the findings were reviewed by the court. Cf. Boddie v. Connecticut, supra, 401 U. S. at 379, 91 S.Ct. 780; Goldberg v. Kelly, 397 U.S. 254 at 263-265, 90 S.Ct. 1011, 25 L.Ed.2d 287. Local 46 was afforded such judicial review. Affidavits and documents previously submitted to the administrator were reviewed by the court. Oral argument was heard on the motion for an order of approval and the parties were offered more time in which to submit further evidence. The court's memorandum of findings reflects full consideration of all the union's claims and sufficiently explains its finding to support the recommended changes. Ruling on JAC's request for a hearing, the court could find no question raised on which to hold such hearing; the union even now has not presented this court with an issue which would require a hearing. Having declined the court's invitation to submit further documentary evidence, the union indicated that it has been offered ample opportunity to be heard. We agree.
 
 
 23
 Due process requires that the facts upon which judgment is based be made known to the parties. So long as the basis of judgment is available to the parties, arbitrary action as well as error can be corrected by the reviewing court. See Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 302-303, 57 S.Ct. 724, 81 L.Ed. 1093 (1937). The facts relied on, and their sources, as well as the administrator's analysis of the problem, were clearly and adequately delineated in the study and comments. We find no merit in appellants' claim of an infringement of its right to due process for lack of a written evidentiary record.
 
 
 24
 Through an innovative decree Judge Frankel has attempted to carry into effect the mandate of Title VII in the first instance through voluntary cooperation rather than through court imposed rules and sanctions. Fundamental to the success of the decree was the union's fulfilling its responsibility to contribute to the reshaping of union practices and policies. Local 46 urges that because it gave the administrator no evidence of the conditions of the industry, and because it did not effectively participate in developing the plans to make fair and nondiscriminatory its work referral system, the court's order cannot stand. The local seeks to start the whole proceeding over again through a hearing process which the settlement was to have made unnecessary. Meanwhile minority workers would continue to be denied the opportunity to earn a living in the industry. We find no warrant or need for such a procedure. We cannot allow the union now to undermine the whole two years work on the grounds of its own dereliction of duty.
 
 
 25
 The judgment is affirmed.
 
 
 
 [1]
 Under the agreement, the union had the right to stop issuing permits "in accordance with work requirements from time to time. . . ."
 
 
 [2]
 The consent decree provided that breach of the agreement would be punishable as a contempt of the court
 
 
 [3]
 Local 46 has exclusive jurisdiction in New York City, and Nassau, Suffolk and Westchester Counties of metal lathing and furring (inside work) and concrete reinforcing (outside work). Outside work is available both to union members and non-union workers who hold work permits issued by the union. Any restriction by the union on permits must affect minority group workers in this industry. The record shows that there were only four non-white union members in Local 46. All other non-white workers would have to go through the permit system
 
 
 [4]
 For a detailed discussion of the methods by which the union circumvented the hiring hall procedure, see the court's findings in the contempt proceeding, United States v. Wood, Wire and Metal Lathers, 328 F.Supp. 429 (S.D.N.Y.1971)
 
 
 [5]
 Hearings are still being held by a special master to determine individual awards. Thus as there has been no final order for the contempt proceeding no appeal has been taken
 
 
 [6]
 The 250 permit floor was based on data from Minority Manpower Statistics published by the New York State Department of Labor, Division of Employment, and an order of the Assistant Secretary of Labor, Arthur Fletcher, establishing ranges for Revised Philadelphia Plan. The data showed that due to attrition and growth the industry could use at least 250 new workers yearly
 
 
 [7]
 Citing a lack of any reliable basis for approximating the level of Negro or minority participation in the industry or work jurisdiction of the union had equal opportunity been available, the administrator resorted to the minority's representation in the total population area
 
 
 [8]
 42 U.S.C. Sec. 2000e-2(j) provides:
 Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section or other area.
 
 
 [9]
 In civil actions by aggrieved parties the courts are empowered to "order such affirmative action as may be appropriate, which may include reinstatement or hiring of employees, with or without back pay. . . ." 43 U.S.C. Sec. 2000e-5 (g)
 
 
 [10]
 ". . . the pattern and practice of discrimination has continued." (Contempt proceedings, 328 F.Supp. at 434)
 "The attempt to cure the stark pattern of racial discrimination in defendant union has entailed long labors by many people, all still far from ended." (Memorandum of Judge Frankel after denying request for stay of order pending appeal, 341 F.Supp. 694, 698 (S.D.N.Y.1972)).
 
 
 [11]
 In 1968, of 1450-1500 union members, four were black. No non-white received a permit until 1966. In 1970, only 165 of 2000 permit holders were non-white. 328 F.Supp. at 432. Statistics may establish a prima facie case of discrimination. United States v. Ironworkers, Local 86, 443 F.2d at 551
 
 
 [12]
 The limited duration of the mandatory permit issuance demonstrates that preference is to be used only as is necessary to remedy past discrimination. Objective standards implemented under the agreement will assure present and future permit issuance work referral for nonwhites
 The court in United States v. Central Motor Lines, Inc., finding that since filing of the suit the employer had hired six whites and no blacks for over the road work, ordered the line to hire six blacks from among its employees for over the road work within 15 days and to hire any further over the road drivers on a 50-50 basis, 325 F.Supp. 478 (W.D.N.C. 1970). In United States v. Ironworkers, Local 86, the union was required to select and indenture sufficient black applicants to overcome past discrimination. The court affirmed the district court order setting up guidelines which would require one union to insure that at least 30% of each class or 7 new apprentices per respective JATC annually (whichever was greater) were black. 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). Sitting en banc, the Eighth Circuit considered the anti-preference provision of Title VII and concluding that it would not limit the court's power to remedy effects of unlawful practices, modified and reinstated a district court order that one worker of every three admitted by the union had to be non-white until at least 20 had been admitted. Carter v. Gallagher, supra. Although jurisdiction in the case was based on the Fourteenth Amendment and the Civil Rights Act of 1870, the court addressed itself to Title VII and discussed Title VII cases.
 
 
 [13]
 The record shows that during the time the permit window was closed, there was an unfilled need for minority laborers
 
 
 [14]
 The union does not contest the accuracy of the statistics used but rather contends that certain factors were not taken into account and that the statistics used were not relevant to the present condition of the industry. The court found that even considering the factors suggested by the union the findings of the administrator as to the number of jobs to be expected were reasonable