**UNITED STATES of America,
Plaintiff,**

v.

**LOCAL 638, ENTERPRISE ASSOCIATION OF STEAM, HOT WATER, HYDRAULIC SPRINKLER, PNEUMATIC TUBE, COMPRESSED AIR, ICE MACHINE, AIR CONDITIONING AND GENERAL PIPEFITTERS, et al., Defendants.**

**George RIOS et al., Plaintiffs
(Complainants),**

v.

**ENTERPRISE ASSOCIATION STEAMFITTERS LOCAL UNION #638 OF U.A. et al., Defendants (Respondents).**

**Nos. 71 Civ. 2877, 71 Civ. 847.**

United States District Court,
S. D. New York.

June 21, 1973.

See also 54 F.R.D. 234.

Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., for the Government; Joel B. Harris, Steven J. Glassman, Asst. U. S. Attys., of counsel.

Dennis R. Yeager, E. Richard Larson, New York City, for plaintiffs in 71 Civ. 847.

Delson & Gordon, New York City, for defendants Local 638 and the union members of JAC; Ernest Fleischman, Richard S. Brook, New York City, of counsel.

Breed, Abbott & Morgan, New York City, for defendants MCA and the employer members of JAC; Thomas A. Shaw, Jr., Kevin T. O'Reilly, New York City, of counsel.

## OPINION

BONSAL, District Judge.

This is an action brought by the Attorney General of the United States under Title VII of the Civil Rights Act of 1964 ("Title VII") (42 U.S.C. § 2000e et seq.) pursuant to authority granted to the Attorney General in that Act (42 U.S.C. § 2000e–6(a)). The defendants are four local unions in the building trades industry servicing metropolitan New York, and their counterpart Joint Apprenticeship Committees and employee associations. Separate trials were ordered for each local union and its counterparts. See, e.g., the case involving Local 40, United States v. Local 638, Enterprise Association, etc., et al., 347 F. Supp. 169 (S.D.N.Y.1972) (Gurfein, J.).

In the case of Local 638, Enterprise Association of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Compressed Air, Ice Machine, Air Conditioning and General Pipefitters (hereinafter "Local 638"), the government's action (United States v. Local 638, et al., 71 Civ. 2877) was consolidated for purposes of trial with a private action (Rios v. Enterprise Association, etc. Local Union # 638, et al., 71 Civ. 847) which had been instituted by four "nonwhites"[1]— allegedly the victims of unlawful employment discrimination—against Local 638, the Mechanical Contractors' Association (MCA), and the Steamfitting Industry's Joint Apprenticeship Committee (JAC). By order of Judge Tenney, the private action has proceeded as a class action on behalf of two distinct classes: a) all Negro and Spanish-surnamed Americans residing in New York City and the Counties of Suffolk and Nassau in the State of New York who now or at any time in the future have the skills necessary to work as journeymen steamfitters; and b) all Negro and Spanish-surnamed Americans residing in New York City and the Counties of Suffolk and Nassau in the State of New York who now or at any time in the future are capable of learning such skills and who wish to obtain access to steamfitting work in New York City and said Counties.[2]

A trial of the consolidated action commenced on January 15, 1973 and concluded on January 26, 1973. Decision was reserved, and the parties have submitted Proposed Findings of Fact, Con-

---

1. The term "nonwhites" as used in this Opinion refers to black and Spanish-surnamed individuals.

2. See Memorandum filed in Rios v. Enterprise Association Steamfitters Local Union #638, 71 Civ. 847 (S.D.N.Y. August 10, 1971) (Tenney, J.).

clusions of Law, and supporting Post Trial Memoranda.

## THE COMPLAINTS

*A. The Government Action* (United States v. Local 638, etc., et al., 71 Civ. 2877)

Named as defendants in the government action are Local 638, MCA, and JAC. MCA is named as a defendant "for purposes of relief only pursuant to Rule 19(a)(1) of the Federal Rules of Civil Procedure." The complaint alleges that Local 638 is engaged in a pattern and practice of resistance to the full enjoyment by nonwhites of rights secured to them by Title VII of the Civil Rights Act [3] by:

"(a) [f]ailing and refusing to admit nonwhite workmen into . . . [Local 638] as journeymen members on the same basis as whites are admitted;

"(b) [f]ailing and refusing to refer nonwhite workmen for employment within [its jurisdiction] on the same basis as whites are referred by applying standards for referral which have the purpose and effect of ensuring referral priority to . . . A Branch members, nearly all of whom are white, thereby perpetuating the effects of [its] past discrimination;

"(c) [f]ailing and refusing to recruit blacks for membership in and employment through . . . [Local 638] on the same basis as whites are recruited;

"(d) [f]ailing and refusing to permit contractors with whom . . . [Local 638 has] collective bargaining agreements to fulfill the affirmative action obligations imposed upon those

contractors by Executive Order 11246 by refusing to refer out blacks whom such contractors wish to employ;

"(e) [f]ailing and refusing to take reasonable steps to make known to non-white workmen the opportunities for employment in the . . . [steamfitting trade] . . . or otherwise to take affirmative action to overcome the effects of past racially discriminatory policies and practices."

The complaint alleges that JAC also is engaged in a pattern and practice of resistance to the full enjoyment by nonwhites of rights secured to them by Title VII by:

"(a) [f]ailing and refusing to make information concerning apprenticeship opportunities available to non-whites on the same basis as it is made available to whites;

"(b) [f]ailing and refusing to make apprenticeship opportunities available to non-whites on the same basis as they are made available to whites by giving a preference in the selection of apprentices to friends and relatives of union members, nearly all of whom are white;

"(c) [a]dopting standards for the selection of apprentices which are not job related and which operate to disqualify a disproportionate number of non-white applicants for apprenticeship."

*B. The Rios Action* (Rios, et al. v. Enterprise Association Steamfitters Local Union #638, etc., 71 Civ. 847)

This class action was brought by four nonwhites [4] on behalf of nonwhites who have, or are capable of learning, the

---

3. 42 U.S.C. § 2000e–2(c) and § 2000e–2(d).

4. The complaint sets forth that "[p]laintiffs Rios, Jenkins, and Lewis are fully qualified steamfitters whom the Union [Local 638] refuses to refer for work and

to admit to membership. Plaintiff Rutledge has been denied admission to the apprenticeship program operated by the Defendants even though he is intelligent, able-bodied and fully capable of doing steamfitting work if given reasonable training."

skills necessary to work as journeymen steamfitters within the jurisdiction of Local 638.[5] The complaint names as defendants Local 638, MCA, and JAC, and alleges that the three defendants in concert have failed to admit plaintiffs to membership in the A Branch of Local 638 (journeymen) and to participation in the JAC apprenticeship program on the same basis as whites, and that the defendants have failed to provide non-white A Branch members with equal access to job opportunities as journeymen steamfitters. Plaintiffs sue under the Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1981 and 1983, and Title VII.

Defendant MCA has moved to dismiss the Rios complaint against it on the grounds that it is neither an "employer" within the meaning of 42 U.S.C. § 2000e–2(a) nor an "employment agency" within the meaning of § 2000e–2(b), and that the complaint fails to state a cause of action against it. Plaintiffs oppose MCA's motion.

## BACKGROUND FACTS

1. Local 638 is a labor union whose territorial jurisdiction consists of the five boroughs of the City of New York and Nassau and Suffolk counties.

2. Local 638 is a member of the United Association of Journeymen and Apprentices of the Plumbing and Pipe-fitting Industry ("United Association").

3. Local 638 represents its members in collective bargaining with defendant MCA and other steamfitter contractors.

4. Local 638 has two branches: a construction or A Branch, whose members have the status of journeymen and do mainly construction work; and a metal trades or B Branch, whose members work in shops and do repair work.

5. Since 1960, the journeymen membership of the A Branch has been as follows:

| Year | Total Members | Blacks | Spanish-surnamed |
|------|------|------|------|
| 1960 | 3644 | 0 | 0 |
| 1961 | 3587 | 0 | 0 |
| 1962 | 3541 | 0 | 0 |
| 1963 | 3528 | 0 | 0 |
| 1964 | 3598 | 0 | 0 |
| 1965 | 3541 | 0 | 0 |
| 1966 | 3549 | 0 | 0 |
| 1967 | 3646 | 5 | 2 |
| 1968 | 3822 | 5 | 2 |
| 1969 | 3866 | 14 | 7 |
| 1970 | 3827 | 14 | 7 |
| 1971 | 3850 | 21 | 10 |
| 1972 | 4198 * | 129 | 62 |

* Computed from the stipulated number of members in 1971 plus the stipulated number of additional members during 1972.

6. Since 1960, the number of members of the B Branch has been as follows:

| Year | Total Members | Blacks | Spanish-surnamed |
|------|------|------|------|
| 1960 | 2220 | | |
| 1961 | 2337 | | |
| 1962 | 2545 | | |
| 1963 | 2657 | | |
| 1964 | 2847 | | |
| 1965 | 2809 | | |
| 1966 | 2875 | | |
| 1967 | 2774 | | |
| 1968 | 2866 | | |
| 1969 | 3335 | | |
| 1970 | 3656 | | |
| 1971 | 3862 | 300 * | 200 * |

* Approximate. Figures were not available for prior years.

7. As of September, 1971, at least 399 (11%) of the A Branch members were related by blood or marriage to other members of the union; it is common for relatives to be working on the same job site.

8. Members of the A Branch have a higher hourly rate of pay than members of the B Branch. Being a member of the A Branch is a substantial aid in obtaining a job as a construction steamfitter in the territorial jurisdiction of Local 638 and is a prerequisite to obtaining job security and preventing early

---

5. See Rios v. Enterprise Association Steamfitters Local Union No. 638, 326 F.Supp. 198 (S.D.N.Y.1971) (Frankel, J.) (decision on motion of plaintiffs for a preliminary injunction.

layoffs. Another advantage of A Branch membership is the greater opportunity for advancement and for earning overtime pay.

9. Workers in the construction steamfitting industry are engaged in the installation of refrigeration, air conditioning, heating, ventilating, pneumatic tube, and sprinkler systems in office buildings, apartment houses, power plants, and other large structures. It is the job of steamfitters on these construction sites to connect the various pipes, pumps, ducts, fixtures, and valves that these systems require. It is necessary for a steamfitter to know how to measure, cut, thread, and connect pipe. In addition, it is necessary that at least some of the steamfitters on a job site know how to weld pipe "in position." Since incompetent work may necessitate redoing the job or may endanger fellow workers or future occupants of the structure, steamfitters must know and follow recognized safety procedures.

10. MCA is a trade association of approximately 60 heating, ventilating, and air conditioning contractors in the New York area. While the total number of contractors employing steamfitters exceeds 300, the 60 MCA members employ the major share of the steamfitter labor force. MCA represents its members in collective bargaining negotiations and other labor relations matters with Local 638.

11. Pursuant to a 1960 Declaration of Trust, the Steamfitters Industry Educational Fund was created, with a Board of Trustees, four of whom are chosen by Local 638 and four by MCA. The trustees appoint JAC, a joint labor-management committee of eight members.

12. All of the present and past officers and business agents of Local 638 are white. All of the present and past officers of MCA are white. Since its formation, all members and employees of JAC have been white.

13. In 1973, the nonwhite membership of the A Branch (191 members) constituted 4.5% of the total membership of the A Branch. According to 1970 census figures, the related population statistics for the seven counties within the jurisdiction of Local 638 [6] are as follows: Black and Puerto Rican persons constitute 25.09% of the total population of the seven counties; black persons and persons reporting the Spanish language as their mother tongue constitute 30.06% of the total population of the seven counties.

14. Each applicant for membership in the A Branch must have at least five years of practical working experience in the plumbing and pipefitting industry and must be of good moral character. In some instances, these requirements have not been strictly adhered to.[7]

15. Procedurally, applicants to the A Branch send letters to the union stating their qualifications, which letters are reviewed by a committee composed of three of the union's officers. These applications are kept on file and when additional members are needed—a determination which is based upon the demand for labor—applicants are called down, interviewed, and if they have the necessary qualifications, accepted.

16. The steamfitting industry is subject to fluctuations and cyclical unemployment. During the years from 1960

---

6. Local 638's jurisdiction covers the following counties: Bronx, Kings, Nassau, New York, Queens, Richmond, and Suffolk. The population figures are taken from U. S. Department of Commerce, Bureau of the Census, Census of Population: General Social and Economic Characteristics, New York (PC (1)–C34 N.Y.) (1970).

7. For example, the evidence at trial disclosed that Thaddeus Kryjak became a member of the A Branch of Local 638 through the sponsorship of his father-in-law after about three years experience; Frederick Gruter became a member of the A Branch after about two years as a helper; Frank Catapano transferred to the A Branch from the B Branch after 4 years of experience.

to 1969, the total dollar value of all steamfitting contracts awarded to members of MCA to be performed within New York City and Nassau and Suffolk counties was as follows:

| 1960 | $ 88,830,736 |
|------|--------------|
| 1961 | 92,464,643 |
| 1962 | 104,869,893 |
| 1963 | 99,095,020 |
| 1964 | 94,227,895 |
| 1965 | 77,570,242 |
| 1966 | 93,103,558 |
| 1967 | 95,759,129 |
| 1968 | 107,966,466 |
| 1969 | 118,990,480 |

17. In the post-war era, there has been a shortage of construction steamfitters in the New York area as well as a shortage of welders. Employers have been required to expend substantial monies for overtime. A computer study of overtime hours from 1967 to 1971 indicates the following:

| Year | Total overtime hours * | Average per week |
|------|------------------------|------------------|
| 1967 | 481,967 | 2.47 |
| 1968 | 432,206 | 2.97 |
| 1969 | 453,807 | 2.96 |
| 1970 | 541,195 | 3.55 |
| 1971 | 724,172 | 3.67 |

* The term "overtime hours" includes both hours worked in excess of the normal 7-hour day and also hours worked outside of the usual work schedule, from 8:00 a. m. to 3:30 p. m.

18. By reason of the shortage of manpower, Local 638 has referred B Branch men to work as construction steamfitters.

19. Local 638's application procedures are designed to keep the A Branch from being flooded, by admission of only a small number of new A Branch members, which tends to continue the shortage of A men and tends to give them job security and overtime.

20. Local 638 does not maintain a hiring hall, nor does it keep formal records of available jobs or of unemployed steamfitters who are seeking work within its territorial jurisdiction. The general practice is for steamfitting contractors to maintain steady crews, which are moved from job to job as work on new contracts begins and old contracts are completed. Hiring of men in addition to the steady crews is done directly by some contractors; other contractors hire men through their superintendents and in fewer instances through their foremen.

21. There is no formal method of referring workers for employment in the steamfitting industry in the New York area. Information concerning available employment is circulated informally by word of mouth and other means. Steamfitters seek work primarily by contacting A Branch members of Local 638, employers' foremen and superintendents, and occasionally officers and agents of Local 638. Employers seek steamfitters by contacting members of Local 638 through their superintendents and foremen, and by contacting Local 638 and MCA.

22. JAC conducts a 5-year apprenticeship training program consisting of a total of 720 hours of classroom work at the Delehanty Institute and Voorhees Technical Institute and 9100 hours of employment with steamfitter employers at construction sites. Upon successful completion of the program, an apprentice becomes a journeyman member of the A Branch. The apprenticeship program was designed and developed by the United Association and the Mechanical Contractors Association of America in consultation with the United States Department of Labor, Bureau of Apprenticeship and Training. The national program has been registered with the United States Department of Labor, and the local program has been registered with the New York State Department of Labor.

23. Apprentices are paid a percentage of a journeyman's wages according to the following schedule:

| 1st year | 40% of journeyman wages |
| 2nd year | 50% " " " |
| 3rd year | 60% " " " |
| 4th year | 70% " " " |
| 5th year | 85% " " " |

In addition, apprentices receive fringe benefits. The collective bargaining agreement also requires contractors to pay apprentices for five of the seven hours of class which apprentices attend

once every other week, with some members of MCA voluntarily paying apprentices for the full 7-hour work day.

24. The first apprenticeship class was formed by JAC on December 15, 1947. As of July 19, 1971 (after the most recent class was indentured) 973 of the journeymen members of the A Branch had at some time been enrolled in the apprenticeship program. This number constitutes less than 25% of the total membership of the A Branch at present, though the percentage of members of the A Branch who are graduates of the apprenticeship program is increasing.

25. Prior to 1964, apprenticeship applicants were selected on the basis of a personal interview conducted by members of JAC and there was no formal method of announcing the formation of new apprenticeship classes. No non-whites became apprentices prior to 1964.

26. JAC instituted a written aptitude examination as part of the apprenticeship program selection procedure in 1964. In that year, JAC, with the advice of New York University, was responsible for the selection of the tests and the determination of the passing score. There were no classes indentured in 1965 and 1966. In 1967, 1968, 1969, 1970, and 1971, JAC, with the advice of the Stevens Institute of Technology, was responsible for the selection of the tests and determination of the passing score. The written aptitude examination was in four parts: 1) Verbal meaning (the ability to understand ideas in words); 2) Numerical ability (the ability to work with numbers and handle simple quantitative problems); 3) Mechanical reasoning (the ability to understand and apply basic mechanical principles); and 4) Spatial relations (the ability to visualize objects in 3-dimensional space).

27. In 1964, no applicant was refused admission to the program on the basis of his test scores. Since 1967, the test results have been as follows: Of the 1177 white applicants who have taken a written examination, 487 (41.37%) passed; of the 106 black applicants, 11 (10.37%) passed; and of the 18 Spanish-surnamed applicants, 2 (11.11%) passed.[8]

28. Since 1966, applicants have been required to furnish: 1) a high school or equivalency diploma; 2) evidence that they are between 18 and 24 years of age, with an allowance for military service up to the age of 28; 3) a listing of arrests and the outcome of each, except for minor traffic violations; 4) evidence of residency in the New York metropolitan area for three years (reduced to one year in 1968); 5) sponsorship by a member of the A Branch; and are required to undergo a physical examination by a doctor selected by JAC. Applicants were also given an oral interview by members of JAC to orient them to the apprenticeship program, but there is no evidence that admission to the apprenticeship program has been denied solely on the basis of the oral interview.

29. Since the filing of the *Rios* action in 1971, JAC has modified its standards for admission to the apprenticeship program.

30. With respect to the class to be indentured in 1973, JAC proposes the following requirements: 1) that the applicant take and pass one of the tests (S–61R) of the General Aptitude Test Battery (GATB) of the United States Training and Employment Service; 2) that the applicant be between the ages of 18 and 24 (with credit for military service up to the age of 28); 3) that the applicant have a high school or equivalency diploma; and 4) that the applicant demonstrate physical capacity to do the work. In addition, JAC proposes to conduct an interview of applicants and at such time to inquire about each applicant's motivation, education,

---

8. The parties stipulated to the breakdown of the test scores as set forth in the Appendix.

work history, health, and family background, though at the time of the trial, no format for the interview had been determined.[9]

31. As of July 9, 1971, there were 408 participants in the apprenticeship program of whom 12 (2.94%) were black and 4 (0.98%) were Spanish-surnamed. In June 1972, 32 apprentices (all of them white) graduated from the program; currently there are 376 participants in the apprenticeship program of whom 12 (3.19%) are black and 4 (1.08%) are Spanish-surnamed.

32. Since 1964, 492 apprentices have been indentured of whom 464 (94.3%) were white, 23 (4.67%) were black, and 5 (1.01%) were Spanish-surnamed, as follows:

|      | White | Black | Spanish-surnamed | Total |
|------|-------|-------|------------------|-------|
| 1964 | 47    | 7     | 1                | 55    |
| 1965 | 0     | 0     | 0                | 0     |
| 1966 | 0     | 0     | 0                | 0     |
| 1967 | 43    | 2     | 0                | 45    |
| 1968 | 86    | 5     | 2                | 93    |
| 1969 | 94    | 5     | 2                | 101   |
| 1970 | 94    | 2     | 0                | 96    |
| 1971 | 100   | 2     | 0                | 102   |
| 1972 | 0     | 0     | 0                | 0     |
| Totals | 464 | 23    | 5                | 492   |

33. Of the 492 apprentices who have been indentured since 1964, 31 whites (6.7%) and 7 nonwhites (25%) had dropped out of the program by the end of 1971.

34. MCA, in its collective bargaining negotiations in 1966 and 1969, proposed to amend the previous agreements to require the indenturing into the industry of a minimum of 150 new apprentices annually, which proposals were not incorporated in the resulting collective bargaining agreements. The union's stated reason for rejection of such proposals was to ensure reasonably continuous employment opportunities for apprentices as required by the New York State Department of Labor, Bureau of Apprenticeship Training.

35. The principal affirmative action taken by Local 638 and JAC to increase nonwhite participation in the steamfitting industry has been its participation in the New York Plan since its inception in 1971. The New York Plan is a joint effort of the construction industry, New York City, and New York State to increase the participation of minority employees in the construction industry. The Plan's goal has been to recruit and place in jobs 800 minority trainees who are above the age of enrollment in the various apprenticeship programs in the construction industry.

36. Of the 800 trainee positions, 90 "slots" were allocated to Local 638, which placed 81 trainees. Currently, 66 trainees are actively employed. The qualifications of those trainees are assessed by representatives of Local 638, MCA, and a minority group representative of the Plan. Some of the Local 638 trainees have received advanced placement and, consequently, receive the wages of more advanced apprentices.

37. The New York Plan has not been an unqualified success. Trainees are not told that they will automatically become members of the A Branch when they complete the program, and only one nonwhite has become an A Branch member. In January, 1973, New York City withdrew from the Plan on the grounds that the small number of trainees placed was unacceptable.

38. In the past, Local 638 has discriminated against minority workmen in admitting members to the A Branch. There were no nonwhite journeyman members of the A Branch until 1967. Since 1967, only five nonwhites have become journeyman members of the A Branch through the apprentice program.

9. During the pendency of this action, JAC conducted interviews of approximately 1400 apprenticeship applicants for the 1973 class. The Court was advised that based on the information obtained at the interviews and on the results of the written examination, the applicants were ranked from "1" to "1400". The parties propose that selections be made from this list.

## DISCRIMINATION IN ADMISSION TO THE A BRANCH

In issuing the preliminary injunction of January 3, 1972 (in the Government action), this Court found that Local 638 had discriminated against nonwhites in admissions to the A Branch. Both the admission figures for 1972 and the membership and population statistics indicate that discriminatory practices have not been corrected.

■ Since January 1, 1972, 160 black and Spanish-surnamed workers already employed in the steamfitting industry were admitted to full journeyman status in the A Branch; this number represents 154 of the 169 workers whose admission was directed by Order of this Court dated January 3, 1972, and 6 who were admitted pursuant to agreement between the Government and Local 638. Other than as a result of this Order, no nonwhites were admitted to the A Branch in 1972. On the other hand, 156 whites were admitted to the A Branch without completing the apprenticeship program and without taking either a written or a practical examination, and an additional 32 whites were admitted to the A Branch through the apprenticeship program. This practice of admitting whites by informal standards and without reference to the apprenticeship program while denying such admission to nonwhites is discriminatory and unlawful. See United States v. Bethlehem Steel Corporation, 446 F.2d 652 (2d Cir. 1971).

■ The membership and population statistics also suggest that Local 638 has engaged in a pattern and practice of discrimination against nonwhites. The present membership of the A Branch of Local 638 is 4.5% nonwhite, while the population of New York City and Nassau and Suffolk Counties, according to available 1970 census statistics, is approximately 25.09% to 30.06% nonwhite. These figures and the testimony at trial support the prima facie showing of discriminatory conduct made by the Government at the time of the issuance of this Court's preliminary injunction. See United States v. Wood, Wire and Metal Lathers International Union, Local No. 46, 471 F.2d 408, 414 n.11 (2d Cir.), cert. denied, 41 U.S.L.W. 3643 (U.S. June 11, 1973); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir. 1970) and cases cited therein; Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (10th Cir. 1970); United States v. Hayes International Corp., 415 F.2d 1038, 1043 (5th Cir. 1969). Cf. Stone v. F.C.C., 151 U.S.App.D.C. 145, 466 F.2d 316, 332 (1972); Roberts v. St. Louis Southwestern Ry., 329 F.Supp. 973, 977 (E.D.Ark. 1971).

■ It is not necessary to determine whether Local 638 has purposefully discriminated in admissions to the A Branch in order to find its practices unlawful. As the Supreme Court declared in Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971):

> "[G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability."

See also Chance v. Board of Examiners, 458 F.2d 1167, 1175–1178 (2d Cir. 1972), aff'g 330 F.Supp. 203, 223 (S.D. N.Y.1971).

■ In light of the foregoing, the Court finds that Local 638, in the past and continuing to the present, has engaged in a pattern and practice of discrimination against nonwhites in admission to the A Branch.

■ Under Title VII, district courts have been vested wth broad power to grant affirmative relief to combat the often subtle practices of discrimination. United States v. Wood, Wire and Metal Lathers International Union, Local No. 46, supra, 471 F.2d at 413 & n.9. The evidence at trial, including the testimony as to various Armed Forces programs for training men in basic plumb-

ing and steamfitting skills,[10] satisfies the Court that the basic skills of the steamfitting trade can be readily taught to nonwhites. Moreover, the history of past discrimination makes it imperative that nonwhite workmen should be admitted to the A Branch as soon as they can demonstrate that they have the necessary skills. Certainly, graduates of the apprenticeship program should qualify for admission to the A Branch as soon as they complete the program. But in addition, a way should be devised to admit others who have experience in the trade and who demonstrate, by means of a practical examination, that they possess the skills necessary to work as journeymen steamfitters.

## DISCRIMINATION IN WORK REFERRAL

The general practice in the steamfitting industry is for contractors to maintain steady crews of men, which are shifted from site to site as construction needs change. When additional men are needed, site foremen or superintendents generally hire men from among those who apply for work by visiting the sites and contacting the foremen. Steamfitters learn of openings by contacting A Branch members who are working on sites needing men or who hear of openings; occasionally they seek the help of Local 638's business agents or officers.

Local 638, however, does not maintain a hiring hall, nor is there any formal referral mechanism or service in the industry in New York City. Local 638 does not keep formal records of available jobs nor of steamfitters seeking work. The foremen and on-site superintendents, who occasionally hire steamfitters to supplement their regular crews, are for the most part white,[11] and, as the evidence at trial indicated, many are present or former members of the A Branch of Local 638. In addition, at least 11% of the members of the A Branch as of the commencement of the present actions are related by blood or marriage to other members of the union.

While there is no evidence that either Local 638 or MCA has engaged in purposeful discrimination against nonwhites[12] the conditions of the industry set forth above, in combination with the history of discrimination in admissions to the A Branch of Local 638, give whites advantages in obtaining employment. The result is the preservation of the effects of past discrimination. Accordingly, the referral practices of the steamfitting industry must be modified if past discriminatory patterns are to be corrected. See United States v. Local 638, Enterprises Association, etc., et al., 347 F.Supp. 169, 180–181 (S.D.N.Y. 1972) (Gurfein, J.), and cases cited therein.

This Court has broad power under Title VII to grant affirmative relief to correct the subtle and elusive patterns of discrimination. Cf. Morrow v. Crisler, 479 F.2d 960 (5th Cir. 1973). A first

---

10. There was testimony at the trial that the United States Navy conducts a training program for utilities men covering the basic skills of pipefitting, plumbing, boiler operation, water treatment, sanitation, refrigeration, and air conditioning. The course (termed the "A School") includes both classroom and practical instruction and lasts 14 weeks. Afterwards, the men receive ratings as designated utilities men, and they are sent out to work with a naval contruction battalion for further "on the job training" for a period of approximately 2 years. In addition, the Navy maintains a school (the "B School") for more advanced training.

11. The evidence indicates that at the time of the trial, there were two nonwhite employers and two nonwhite foremen in the New York area. The evidence also discloses that all of the present officers and business agents of Local 638 and all the officers of MCA are white.

12. Compare the situation found to exist in the metallic lathing, furring, and concrete reinforcing trade, where Judge Frankel found in numerous specific instances that favoritism for whites and discrimination against blacks had been proven. United States v. Wood, Wire and Metal Lathers International Union, Local Union 46, 328 F.Supp. 429, 436–438 (S.D. N.Y.1971), aff'd, 471 F.2d 408 (2d Cir.), cert. denied, 41 U.S.L.W. 3643 (U.S. June 11, 1973).

step should be to require that Local 638 and MCA maintain up to date records of jobs available [13] and of steamfitters seeking work. These records should be open to all interested parties, including employers, MCA, union business agents and officers, individual steamfitters, and "minority referral services." [14] In addition, the Administrator to be appointed hereunder, after studying the industry, will consider and recommend to the Court the adoption of other affirmative action measures to increase nonwhite participation in the steamfitting industry.

## DISCRIMINATION IN THE APPRENTICESHIP PROGRAM

The present apprenticeship program conducted by JAC requires that an apprentice complete five years of training consisting of 720 hours of classroom work and 9100 hours of on-the-job experience before he may become a journeyman member of the A Branch of Local 638. According to testimony at the trial, the present program was designed in consultation with the United Association and the Mechanical Contractors Association of America and is registered with the United States Department of Labor and the New York State Department of Labor.

For the reasons below, however, the Court finds that the present apprenticeship program does not fully meet the requirements of Title VII. Accordingly, the program will be altered as described below and will be subject to further alteration upon the recommendation of the Administrator to be appointed hereunder.

In determining whether the apprenticeship program meets Title VII requirements, the starting point is Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849, 28 L.Ed.2d 158 (1971):

"The [Civil Rights] Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." 401 U.S. at 431, 91 S.Ct. at 853.

The initial question is whether plaintiffs have established that features of the apprenticeship program have a sufficiently discriminatory impact on nonwhite applicants to impose upon the defendants the burden of establishing "job relatedness." Plaintiffs must show that the program disadvantages nonwhites to a "significant and substantial" degree. Chance v. Board of Examiners, 458 F.2d 1167, 1175 (2d Cir. 1972). If plaintiffs make such a showing, then defendants must demonstrate that the practice is justified notwithstanding its discriminatory effect. Chance v. Board of Examiners, *supra*. This involves demonstrating both a "business necessity" for the practice and also that its legitimate ends cannot be served by a reasonably available alternative system with less discriminatory effects. See United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2d Cir. 1971). The requirements of these cases apply with respect to both the method for selecting apprentices and the length and content of the program.

### A. Selection of Apprentices

The first apprenticeship class was formed by JAC in 1947. Until 1964, there were no nonwhites in the program. Since 1964, 492 apprentices have begun training, of whom 464 (94.3%) were white, 23 (4.6%) were black, and 5 (1.01)% were Spanish-surnamed. In 1971 (when the last apprentice class was formed), nonwhites constituted approximately 3.9% of the total number of

13. The list of employers under contract with Local 638, which is now maintained by the union and is furnished to union members, will serve as a starting point. By itself, however, this list is insufficient to inform steamfitters looking for work of which contractors have job opportunities available.

14. E. g., the Recruitment and Training Program, Inc. (formerly the Joint Apprenticeship Program of the Workers Defense League).

participants in the apprenticeship program. Population statistics from the 1970 census indicate that nonwhites constitute approximately 25.09% to 30.06% of the total population of New York City and Nassau and Suffolk Counties. This is sufficient to indicate a prima facie case of discrimination against nonwhites in the selection of apprentices. See United States v. Wood, Wire and Metal Lathers International Union, Local No. 46, *supra*, 471 F.2d at 414 n. 11; Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir. 1970), and cases cited therein. Therefore, the burden is on the defendants to show that the features of the present selection system are justified, notwithstanding the discriminatory impact on nonwhites.

### 1. *The Written Examination*

The stipulated results of the written tests given to apprenticeship applicants since 1967 (but not including the tests given in 1973) indicate that they have had a differential impact on nonwhites when compared with the results for whites. While the passage rate for whites was 41.37%, the passage rate for blacks was 10.37%, and for Spanish-surnamed applicants, 11.11%.

To show that the tests were "job related," defendants produced testimony at trial that the tests were widely used and professionally designed; that they were administered by Stevens Institute of Technology, a reputable testing institution; and that they were reasonably related to measuring the aptitudes they were designed to measure in the following four areas: verbal meaning, numerical ability, mechanical reasoning, and spatial relations. This, however, is not sufficient to demonstrate the written examinations' validity or "job relatedness."

The Equal Employment Opportunity Commission Guidelines on Employee Selection Procedures ("EEOC Guidelines"), 29 C.F.R. § 1607, et seq., recognize three methods of validating the job relatedness of a given test: criterion-related validity, content validity, and construct validity.[15] With respect to the tests given by Stevens Institute, while there was some evidence of construct validity, there was no evidence of their criterion-related validity nor that a criterion-related study had been completed or planned. Without such evidence, the tests used by JAC from 1964 to 1971 cannot be considered job related, notwithstanding the difficulty of devising a fair test or of testing it for validity. *Cf.* Vulcan Society of New York City Fire Department, Inc., et al. v. Civil Service Commission, et al., 360 F.Supp. 1265 (S.D.N.Y., filed June 12, 1973) (Weinfeld, J.).

JAC indicated at trial that in the future it intended to employ a different test to select apprentices. This test is part of the General Aptitude Test Battery ("GATB") of the United States Training and Employment Service and has been denominated "S–61R". A validation study was done on this test in Texas in 1954, though the study did not separately determine the effect of the test on minorities. *Cf.* EEOC Guidelines, 29 C.F.R. § 1607.5(b)(5). While at the present time there is no evidence that S–61R may not discriminate against

15. These terms are defined in American Psychological Association, Standards for Educational and Psychological Tests and Manuals at 12–15 (1966). Evidence of criterion-related validity is preferred; it is demonstrated by "comparing the test scores with one or more external variables considered to provide a direct measure of the characteristic or behavior in question." In employment testing, the comparison is made between test scores and measures of job performance; if there is a sufficient correlation, then the test is considered to have validity in predicting job performance and thus to be "job related." Content validity is demonstrated by "showing how well the content of the test samples the class situations or subject matter about which conclusions are to be drawn." A test has content validity when the content of the test matches the content of the job to be performed. Construct validity is evaluated by "investigating what qualities a test measures, that is, by determining the degree to which certain explanatory concepts or constructs account for performance on the test."

nonwhites, there is equally no evidence that it does. It appears that in other contexts courts have approved use of the GATB. *See, e. g.,* United States v. Local 86, Ironworkers, D.C., 315 F.Supp. 1202, 1246 (1970), aff'd, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). In view of the lack of evidence that S-61R has a differential impact on nonwhites and since JAC does not intend to disqualify apprenticeship applicants solely on the basis of their test results, the Court will permit the use of S-61R pending a further recommendation from the Administrator to be appointed hereunder.

### 2. *Age Requirements*

At present, the apprenticeship program is only open to those applicants who are between the ages of 18 and 24, though credit is given for years spent in military service up to the age of 28. No evidence was presented that this requirement itself had a discriminatory impact on nonwhites; however, in view of the history of past discrimination in the steamfitting industry, this requirement may operate to exclude from the apprenticeship program nonwhites who are now too old to apply. Accordingly, provision will be made so that nonwhites who may have been excluded from the program in the past but who have nevertheless acquired experience in the trade will have the opportunity during a specified period of time to seek admission to the A Branch by passing a practical examination or by obtaining the certification of an employer who is a party to the collective bargaining agreement. In addition, provision will be made so that applicants between the ages of 18 and 30 may apply to the program. JAC may continue thereafter to use an age requirement for admission to the apprenticeship program, though such requirement will be subject to modification upon the recommendations of the Administrator.

### 3. *Educational Requirements*

The present requirements are that applicants have a high school or equivalency diploma. According to 1970 census statistics, 45.8% of nonwhite males between the ages of 18 and 24 and 76.1% of white males between the ages of 18 and 24 in the New York Standard Metropolitan Statistical Area had completed high school. This disparity indicates that such a requirement has a differential impact on nonwhites, operating to exclude a greater number of nonwhites from the apprenticeship program.

In Griggs v. Duke Power Co., *supra,* the Supreme Court found that the requirement of a high school diploma as a condition of employment in a generating plant did not bear a demonstrable relationship to successful job performance. 401 U.S. at 431, 91 S.Ct. 849. On the other hand, in United States v. Local No. 86, Ironworkers, *supra,* the district court approved the use of the high school diploma requirement for applicants to apprentice programs in certain construction trades. 315 F.Supp. at 1246.

On the present evidence, a determination cannot be made as to whether a high school or equivalency diploma is a job-related requirement for admission to the apprenticeship program. It cannot be said, however, that there should be no educational requirement. Certainly, to understand the classroom instruction offered during the apprenticeship program, apprentices must have some schooling. Accordingly, pending a recommendation by the Administrator and the adoption of an affirmative action program, the present educational requirement will be continued.

### 4. *Physical Ability*

The present requirement is that applicants demonstrate the physical capacity to do the work required of a steamfitter. Since no evidence was introduced that this requirement had a differential impact on nonwhites and since physical ability to perform the work is obviously job-related, this requirement needs no further justification.

### 5. *The Interview*

As with the apprenticeship class of 1973, JAC proposes to have applicants

interviewed orally by 2-man teams of JAC members (one to represent Local 638 and one to represent steamfitting contractors). In the interview, the teams will inquire into each applicant's motivation, education, work history, health, and family background. In addition, the interviewers propose to ask each applicant whether he has been convicted of a job-related crime within the past 5 years. ·

■ Since the present format of the interview is a new feature of the selection process, there is no evidence as to whether it has a differential impact on nonwhites. Unless such a showing is made, the Court will permit the use of the interview in the selection of apprentices, pending a recommendation from the Administrator.

### B. Length and Content of the Apprenticeship Program

The present program is 5 years long and includes both classroom instruction for one day every two weeks and also on-the-job experience. The classroom instruction is comprehensive, including both theoretical as well as practical subjects relating to the steamfitting field. The program was developed with the consultation and approval of Local 638 and MCA.

While there is some evidence that nonwhites drop out of the program with greater frequency than whites,[16] the evidence introduced at trial does not disclose with specificity what the underlying reasons were. In any event, JAC plans in the future to decrease to 4 years the length of the program.

■ On the present record, a determination of whether the length and content of the apprenticeship program conforms to the requirements of Title VII cannot be made. Moreover, this is a determination better left to the affirmative action program, which will be adopted after considering the recommen-dations of the Administrator to be appointed hereunder. Accordingly, pending the adoption of the affirmative action program, the present apprenticeship program will be continued in its present form but will be shortened to 4 years.

### MCA's MOTION TO DISMISS

MCA was named in the government action as a defendant for purposes of relief only. In the Rios action, however, MCA was named as a defendant on the merits on the grounds that it is an "employer" within the meaning of 42 U.S.C. § 2000e(b) or an "employment agency" within the meaning of 42 U.S.C. § 2000e(c). In addition, the Rios plaintiffs contend that MCA is properly named as a defendant under 42 U.S.C. § 1981 and § 1983.

Section 2000e(b) provides:

"The term 'employer' means a person engaged in an industry affecting commerce who has twenty-five or more employees . . . and any agent of such a person."

Section 2000e(c) provides:

"The term 'employment agency' means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person."

Section 2000e(a) provides:

"The term 'person' includes one or more individuals, labor unions, partnerships, associations, . . . ."

In Williams v. New Orleans Steamship Association, 341 F.Supp. 613 (E.D.La. 1972), the Court held that an association of employers would be treated as a single employer for purposes of Title VII. There, the complaint named as defendants the New Orleans Steamship Association, its 28 member companies, and 4 local unions, together with the International Longshoremen's Association. Twelve of the member companies moved

---

16. The dropout figures indicate that 31 whites (6.7%) have left the program as compared with 7 nonwhites (25.0%).

to dismiss the complaint against them for lack of jurisdiction inasmuch as they had fewer than the required number of employees to subject them to Title VII's coverage. The Court denied the motion, relying on EEOC policy that "if establishments are part of an integrated enterprise, they may be treated as a single employer for Title VII coverage." 341 F.Supp. at 615. Plaintiffs there had shown that the association controlled employment on the waterfront and established uniform employment policies and practices applicable to all member companies. In addition, the association owned and operated a central hiring hall at which all longshoremen were hired, and derived its broad authority by delegation from its member companies. In determining whether the 28 companies should be treated as a single employer through the entity of the association, the Court followed the practice of the EEOC in focusing on whether there was an interchange of employees and centralized control of labor relations.

■ In view of the national public policy reflected in Title VII to end employment discrimination based on race, color, or national origin, see Hackett v. McGuire Brothers, Inc., 445 F.2d 442, 446–447 (3d Cir. 1971), this Court finds the factors summarized in *Williams* to be persuasive here. Section 2000e(b) includes within the definition of "employer" both a person "who has twenty-five or more employees" and "any agent of such a person." MCA, as a trade association for purposes of unified collective bargaining, performs the functions of an agent for its member contractors. In addition, MCA is equally represented with Local 638 on JAC, which administers the industry's apprenticeship program. MCA members employ the major share of the steamfitter work force in New York City and Nassau and Suffolk Counties, and the terms of the collective bargaining agreement negotiated between MCA and Local 638 prevail throughout the industry. Though there is no hiring hall for steamfitters in the New York area, there is sufficient uniformity of employment conditions, at least with respect to the employment of nonwhites, to support the conclusion that MCA is a proper party defendant in the Rios action.

The district court's decision in Contractors Association of Eastern Pennsylvania v. Secretary of Labor, 311 F.Supp. 1002 (E.D.Pa.1970), aff'd, 442 F.2d 159 (3d Cir. 1971), cited by MCA, held that an association of employers, as apart from its members, did not have standing to challenge a regulation issued by the Department of Labor known as the Revised Philadelphia Plan. MCA argues the same reasoning should apply here. The Court of Appeals, however, termed this holding "at least doubtful." Since the affected contractors were already before the court and since they had all been represented by the same attorney, the Court of Appeals found that "the presence or absence of the Association as a plaintiff [had] no practical significance." 442 F.2d at 166.

Similarly, in United States v. Bricklayers Local No. 1, et al., No. C.–71–65 (W.D.Tenn. filed November 29, 1972), the Court found that the Mason Contractors Association of Memphis, Inc. ("MCAM") was not a proper entity against which relief could be obtained because each of the twelve members of MCAM were also named individually as defendants.

In the present case, MCA has greater influence over and responsibility for employment practices applying to the industry as a whole than any single employer. Moreover, the participation of MCA in an affirmative action program is a necessity if the steamfitting industry is to correct the discriminatory effects of past employment practices.

■ Having found that MCA was properly made a party defendant in the Rios action, this Court, however, does not of course imply that MCA has been responsible *ipso facto* for all the employment practices here found unlawfully discriminatory or that it is liable in damages to the plaintiffs in Rios. Plaintiffs have shown no specific instances of MCA discrimination. Rather,

plaintiffs have demonstrated only that there has been a lack of nonwhite employment in the industry generally and that, in consequence, the industry's referral practices must be changed. For the future, MCA will bear responsibility with Local 638 and JAC to take appropriate affirmative action to correct this situation.

Accordingly, MCA's motion to dismiss the Rios action as to it is denied.[17]

This disposition makes it unnecessary to consider the other grounds for relief urged by the Rios plaintiffs, particularly since little evidence was brought out at trial bearing on issues other than those presented by the Title VII claims.

Plaintiffs in *Rios* seek back pay on behalf of members of the class who can show they have been victims of past discriminatory practices (42 U.S.C. § 2000e–5(g)), and for costs and attorneys' fees (42 U.S.C. § 2000e–5(k)). These issues are reserved for later determination.

The foregoing constitutes the Court's findings of fact and conclusions of law. F.R.Civ.P. 52(a).

The Order and Judgment, in the form reviewed with the attorneys for all parties, is being filed herewith.

It is so ordered.

APPENDIX

| Date | Test | Passing Score | # White Applicants Taking Test | (%) Whites Passed | # Black Applicants Taking Test | (%) Blacks Passed | # Spanish Surnamed Taking Test | (%) Spanish Surnamed Passed |
|---|---|---|---|---|---|---|---|---|
| 4/4/67 | Differential Aptitude, Form M – Verbal Reasoning, Numerical Ability, Mechanical Reasoning and Space Relation Tests | 50% or higher | 173 | 41(23.69%) | 11 | 2(18.18%) | 3 | 0 |
| 12/16/67 | Scat 2A Multiple Aptitude Tests Applied Science and Mechanics Spatial Relations IID & IIID | 50% or higher | 188 | 44(23.40%) | 31 | 1(3.22%) | 7 | 1(14.2%) |
| 7/20/68 | Scat 2B Atkins Spatial I and II Survey of Mechanical Insight | 50% or[1] higher | 137 | 37(27%) | 25 | 1(4.0%) | 4 | 1(25.0%) |
| 1/25/69 | Henmon-Nelson Form B Bennett Mechanical Atkins Spatial | 25% or[2] higher | 157 | 100(63.69%) | 16 | 2(12.5%) | 3 | 0 |
| 1/31/70 | Scat 2B Parts II and III Bennett Mechanical Form T Minnesota Paper Form Board AA | 25% or higher | 202 | 107(52.97%) | 16 | 3(18.75%) | 0 | 0 |
| 11/21/70 | Bennett Mechanical Form S Multiple Aptitude Test – #8 Two Dimensions Differential Aptitude Test – Form in Verbal and Numerical | 25% or higher | 320 | 158(49.37%) | 7 | 2(28.57%) | 1 | 0 |
| Totals | | | 1177 | 487(41.37%)[3] | 106 | 11(10.37%) | 18 | 2(11.11%) |

1. In addition, eleven other applicants were offered admission to the program. Eight of these eleven were chosen on the basis of their cumulative score for all four parts of the exam, from amongst those who had achieved a score of 40th percentile or higher in each of the four components. In addition, three other individuals who had achieved a score of 30th percentile or higher on all four components were invited into the program. Consequently, 45 of the 137 white applicants (32.84%) and 4 of the 25 black applicants (16%) were invited into the program. For effect of this on overall total see footnote 3.

2. In addition, fifteen other applicants were offered admission to the program. Thirteen of these fifteen were chosen on the basis of their cumulative score for all four parts of the exam, from amongst those who failed the examination. In addition, Messrs. Bright and Thomas were invited into the program. Consequently, 94 of the 157 white applicants (59.87%), 5 of the 16 black applicants (31.25%) and 2 of the 3 Spanish surnamed applicants (66.66%) were invited into the program. For effect of this on overall total see footnote 3.

3. Since additional persons were invited into the program (see footnotes 1 and 2), of the 1177 white applicants taking the test, 505 (42.90%) were invited into the program, of the 106 black applicants taking the test 17 (16.03%) were invited into the program, and of the 18 Spanish surnamed applicants taking the test 4 (22.22%) were invited into the program.

17. In view of the foregoing, it is unnecessary to decide if MCA was properly named as a defendant under 42 U.S.C. § 1981 or § 1983.